UNITED STATES of America,
Plaintiff–Appellee,

v.

Helene Donna ALPERT, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Carl Henry ALPERT, Defendant–Appellant.

Nos. 91–8957, 91–9034.

United States Court of Appeals,
Eleventh Circuit.

Aug. 17, 1994.

Alan J. Baverman, Atlanta, GA, for Helene Donna Alpert.

Donald F. Samuel, Garland & Samuel, P.C., Atlanta, GA, for Carl Henry Alpert.

Martin James Weinstein, Amy Weil, Asst. U.S. Attys., Atlanta, GA, for U.S.

Before TJOFLAT, Chief Judge, KRAVITCH, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK and CARNES, Circuit Judges.*

BLACK, Circuit Judge:

In this appeal we discuss the proper application of the United States Sentencing Guidelines (Guidelines or USSG) § 3C1.1 enhancement for obstruction of justice. We also review whether it was permissible under the circumstances of this case for the district court to depart upward from the Guidelines

* Judge Hatchett did not participate in the consideration or decision of this case.

Judge Barkett became a member of the Court after February 18, 1994, when this case was argued and taken under submission. She has elected not to participate in this decision.

sentencing range to account for the duration and extent of fraudulent conduct. We hold that, to permit meaningful appellate review, district courts must make specific findings of fact when they enhance sentences under Guidelines § 3C1.1. We also hold that upward departure from the Guidelines sentencing range to reflect the duration and extent of fraudulent conduct was inappropriate because the Guidelines adequately account for the defendant's fraudulent conduct.

## I. FACTS

In 1988, the United States began investigating credit card and credit-related fraud being committed by Carl and Helene Alpert. By February 1990, the Government had located, served grand jury subpoenas on, and questioned the Alperts. In March, the Alperts' attorneys entered into plea negotiations with the Government; a final session was scheduled for April 1990. The Government withheld indictment during plea negotiations, intending to proceed later by information.[1]

Before the last scheduled plea negotiation meeting in April, the Alperts disappeared. They did not leave a forwarding address with the post office, their landlord, their creditors, Helene's mother, or the Government. Their son did not return to school following a spring holiday, although school officials were not notified of his withdrawal. A U–Haul trailer they rented on April 3, 1990, was later found abandoned in Lebanon, Ohio, but the Government was unable to locate the Alperts. Consequently, plea negotiations ended and the Government presented its case against the Alperts to a grand jury. In September 1990, Carl Alpert was indicted on forty-one counts and Helene Alpert on five counts of credit card and credit-related fraud.

A few days after the indictment, Carl Alpert was arrested in California, where the family had moved, for fraudulently leasing an automobile. Carl gave police a false name upon arrest. A subsequent search of the

Alperts' California home revealed dozens of false documents, indicating that the Alperts had continued to engage in their criminal activity from California. After officials determined that the Alperts had arrest warrants outstanding in Georgia, Carl was transported across the country in custody while Helene was permitted to return to Georgia on her own. In July 1991, Carl pled guilty to forty counts and Helene pled guilty to two counts of the September 1990 indictment.

At the sentencing hearing, the district court determined that the Alperts had defrauded eight financial institutions of almost $500,000 between 1984 and 1990. The district court inferred that their disappearance and subsequent activities slowed down the criminal process and enhanced both of their sentences by two levels under § 3C1.1 for obstructing justice. In addition, the district court enhanced Carl Alpert's sentence by two levels under § 2F1.1(b)(2) because his offenses involved more than minimal planning. The district court then departed upward by an additional three levels in Carl Alpert's sentence: two levels after determining that the Guidelines did not adequately account for the duration and extent of his fraudulent activity, and one level to ensure that his sentence would be double that of his wife.

## II. DISCUSSION

### A. *Obstruction of Justice*

 Guidelines § 3C1.1 provides that a sentence may be enhanced by two levels "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." USSG § 3C1.1. In applying the enhancement, the district court stated, "the defendants leaving town in the middle of plea negotiations without notifying the government and their use of phony names in California once they got there constitutes an obstruction of justice since I infer that it

---

1. Carl Alpert's attorney said:
 These were days when we thought we could sit down and draft what the guideline application would be, and we actually sat down and I said he will get two points for this and no points for

 this, and somehow we actually deceived ourselves into believing we would just submit that to a judge and that's how it would come out, and since then we learned you can't do that....

slowed down the criminal process." The Alperts maintain that the district court erroneously applied the two-level obstruction enhancement. We agree.

 This Court is bound by the Guidelines, including the commentaries that interpret or explain a guideline. *Stinson v. United States,* —— U.S. ——, ——, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993).[2] The commentary accompanying § 3C1.1 states plainly that avoiding or fleeing from arrest does not warrant an enhancement. USSG § 3C1.1, comment. (n. 4(d)). This circuit and other circuits have recognized that successfully avoiding arrest, alone, does not warrant an enhancement for obstruction of justice. *United States v. Burton,* 933 F.2d 916, 918 (11th Cir.1991) (holding that the obstruction enhancement does not apply to flight from law enforcement officers about to make an arrest); *United States v. Madera–Gallegos,* 945 F.2d 264, 266–67 (9th Cir.1991) (holding obstruction enhancement inapplicable to defendants who successfully avoided arrest for nine months, knowing that Government agents were searching for them, but noting that "flight, coupled with other 'obstructive' conduct, may justify the § 3C1.1 enhancement"); *United States v. Sanchez,* 928 F.2d 1450, 1459 (6th Cir.1991) (holding obstruction enhancement inapplicable when "defendants undoubtedly abandoned their known residence in an attempt to avoid being arrested" after learning of the arrest of a co-conspirator). This rule does not mean that such uncooperative conduct must go unpunished. When a district court finds that a defendant engaged in uncooperative conduct that does not warrant the obstruction enhancement, like flight to avoid arrest, the Guidelines note that the district court may sanction that conduct within the applicable guideline range. USSG § 3C1.1, comment. (n. 4).

 We conclude that the § 3C1.1 enhancement does not apply to persons engaged in criminal activity who learn of an investigation into that activity and simply disappear to avoid arrest, without more. Such persons do not face a two-level enhancement for failing to remain within the jurisdiction or for failing to keep the Government apprised of their whereabouts during its pre-indictment investigation.[3] The disappearance may be considered only in determining the defendant's sentence within the otherwise applicable guideline range. In this case, then, the Alperts' sentences should not have been enhanced simply because they moved to California to avoid arrest. The Alperts may have engaged in *additional* conduct while avoiding arrest, however, that would warrant application of the obstruction enhancement, particularly if that conduct significantly hindered the investigation or prosecution of their offenses.

 Certain uncooperative conduct deserves enhancement under § 3C1.1 if it actually obstructs justice. *See* USSG § 3C1.1, comment. (nn. 3 & 4). For example, application note 3(g) mandates the enhancement if a defendant's materially false statement to a law enforcement officer significantly obstructed or impeded the investigation or prosecution of the offense. *Id.* at (n. 3(g)). In order to permit meaningful appellate review, when a district court applies the obstruction enhancement because a defendant made false statements, not under oath, to law enforcement officers, it must find that the statements were false and material. It must also explain how the statements significantly obstructed or impeded the investigation or prosecution of the offense. Similarly, because "providing a false name or identification document at arrest" does not justify the enhancement "except where such conduct actually resulted in a significant hindrance to the investigation or prosecution," *id.* at (n. 4(a)), a district court applying the enhancement because a defendant gave a false name

---

2. A Guidelines' commentary does not bind federal courts if the commentary "violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson,* —— U.S. at ——, 113 S.Ct. at 1915. None of the exceptions identified in *Stinson* are present in this case.

3. Of course, a defendant who escapes from custody or willfully fails to appear for a judicial proceeding as ordered should have his sentence enhanced. USSG § 3C1.1, comment. (n. 3(e)).

at arrest must explain how that conduct significantly hindered the prosecution or investigation of the offense.

■ While we are loathe to further ritualize the sentencing process by requiring district courts to make findings of fact that may perhaps appear obvious to a judge so familiar with the parties and their circumstances, our review of the application of the § 3C1.1 enhancement is a .fact-specific inquiry. *See Burton,* 933 F.2d at 917. In this case, the district court's *inference* that the Alperts' activities slowed down the criminal process does not permit this Court to review the enhancement with a sufficient understanding of the factual circumstances underlying the district court's decision. Clear factual findings are necessary to assess whether one or both of the Alperts did more than simply move to avoid arrest, so that we may review whether they engaged in conduct for which the enhancement was appropriately applied under application notes 3 and 4 of the Guidelines.

We do not suggest that the record in this case cannot support a sentence enhancement for obstruction of justice. We merely hold that the district court's findings were insufficient to permit application of the enhancement. On remand, if the district court applies the § 3C1.1 enhancement, it should note specifically what each defendant did, why that conduct warrants the enhancement, and, if applicable, how that conduct actually hindered the investigation or prosecution of the offense.

### B. *Upward Departure*

■ When it sentenced Carl Alpert, the district court applied the two-level enhancement for more than minimal planning under Guidelines § 2F1.1. The district court then departed upward from the Guidelines range by three additional levels: two levels because it believed that the Guidelines did not adequately account for the "very large number

of affirmative acts of fraud" that "covered so many years, four to five years, and involved so many victims," and one level to ensure that Carl Alpert's sentence was double that of his wife. Carl Alpert does not dispute the district court's application of the two-level enhancement for more than minimal planning. Further, he and the Government agree that since his sentencing this circuit has held that a district court's desire to account for differential culpability among defendants—in this case, to make Carl Alpert's sentence double that of his wife—is not a valid basis for departure.[4] Consequently, only the district court's two-level upward departure designed to account for the duration and extent of the fraud in this case is in dispute. Carl Alpert asserts that this two-level upward departure is precluded because the Guidelines already account for those departure factors cited by the district court. We agree.

■ The Guidelines establish sentencing ranges for cases included in the "heartland [of] typical cases embodying the conduct that each guideline describes." USSG Ch. 1, Pt. A 4(b), p.s. Departure from the Guidelines range should occur only in those atypical cases beyond the "heartland." *Id.* Upward departure from the Guidelines range is permitted only when aggravating circumstances exist that were not adequately considered by the Sentencing Commission when it developed the Guidelines. 18 U.S.C. § 3553(b). The determination that particular circumstances were not adequately considered is a question of law subject to de novo review. *United States v. Valle,* 929 F.2d 629, 631 (11th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 401, 116 L.Ed.2d 350 (1991). The existence of those circumstances, however, is a factual determination made by the district court and reviewed under the clearly erroneous standard. *Id.* If we agree with the district court that the circumstances it cited as grounds for departure were not adequately considered in the Guidelines, we must then

---

4. The district court did not have the benefit of our holding in *United States v. Chotas,* 968 F.2d 1193 (11th Cir.1992), when it sentenced Carl Alpert. We held in *Chotas* that the Guidelines are intended to account for the relative culpability of offenders and that insufficient disparity in the sentences of co-defendants is an improper basis for departure. *Id.* at 1198. In this case, the district court may not depart upward to ensure that Carl Alpert's sentence is double that given Helene Alpert.

determine whether departure based upon those circumstances is consistent with the goals of the Guidelines. *Id.*

The duration and extent of Carl Alpert's fraudulent activity were circumstances that were adequately considered by the Sentencing Commission when it developed § 2F1.1 of the Guidelines. As the Commission itself explained:

> Empirical analyses of pre-guidelines practice showed that the most important factors that determined sentence length were the *amount of loss* and whether the offense was an isolated crime of opportunity or was *sophisticated or repeated.* Accordingly, although they are imperfect, these are the primary factors upon which the guideline has been based.

USSG § 2F1.1, comment. (backg'd.) (emphasis added). Consistent with the Guidelines' goal of sentencing uniformity, § 2F1.1 contains a dollar loss table that substitutes an objective and quantifiable measure of loss in place of a district court's subjective determinations. *See* USSG Ch. 1, Pt. A 4(b), p.s. Section 2F1.1 also includes an enhancement for more than minimal planning that applies when offenses involve "more planning than is typical for commission of the offense in a simple form" and "is deemed present in any case involving repeated acts over a period of time." USSG § 1B1.1, comment. (n. 1(f)). The circumstances the district court cited as a reason for upward departure, rather than being factors not adequately considered by the Sentencing Commission, are the "primary factors" that formed the basis for the specific offense characteristics contained in § 2F1.1.

Carl Alpert defrauded eight financial institutions of almost $500,000. His fraudulent activities are not the atypical case; his conduct is not outside the heartland of that already considered by the Sentencing Commission in developing the Guidelines. We hold, therefore, that upward departure based upon the duration and extent of the fraud in this case is not permitted.

Other circuits have held that there are cases where fraudulent conduct is so extensive and repeated as to warrant departure. *See, e.g., United States v. Benskin,* 926 F.2d 562 (5th Cir.1991) (upward departure warranted for five-year scheme involving over 600 victims and more than $3.8 million); *United States v. Burns,* 893 F.2d 1343 (D.C.Cir.1990) (upward departure warranted for six-year scheme involving fifty-three separate fraudulent acts), *rev'd on other grounds,* 501 U.S. 129, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991). We *recognize* that a future atypical case may warrant upward departure. This, however, is not such a case. As we explained above, Carl Alpert's conduct was adequately considered within Guidelines § 2F1.1. Accordingly, the district court may not apply an upward departure to his sentence to account for the duration and extent of his fraudulent conduct.

## III. CONCLUSION

For the foregoing reasons, we VACATE the sentences of Carl and Helene Alpert and REMAND for resentencing consistent with this opinion.

ANDERSON, Circuit Judge, concurring in part and dissenting in part:

I concur in all of Judge Black's opinion for the court except Part II.A. relating to the obstruction of justice enhancement. With respect to that issue, I am persuaded by Judge Birch's opinion; thus, I join Part I of Judge Birch's opinion relating to that issue.

EDMONDSON, Circuit Judge, concurring in part and dissenting in part:

I agree with the result that Judge Carnes has reached.

CARNES, Circuit Judge, concurring in part and dissenting in part:

I concur in the holding that the district court erred in enhancing the Alperts' sentence for obstruction of justice under U.S.S.G. § 3C1.1, and I join Part II.A of Judge Black's opinion for the Court. For the reasons stated in Part II of Judge Birch's dissenting opinion, I dissent from the holding that the district court in sentencing Carl Alpert erred when it departed upward because of the duration of the conduct and the

number of different fraudulent actions and schemes involved.

BIRCH, Circuit Judge, dissenting:

Because the majority omits or misinterprets material facts in its description of the criminal conduct and the sentencing hearing as well as relies upon inapposite law, I dissent. The majority establishes incorrect precedents for our circuit and places unwarranted restrictions on sentencing judges. I shall address the obstruction of justice and upward departure issues individually with the relevant facts and law applicable to each.

## I. OBSTRUCTION OF JUSTICE

On February 26, 1990, Carl and Helene Alpert, husband and wife, learned of a grand jury investigation into their credit card and credit-related fraud when Helene was served with a grand jury subpoena. She submitted to the United States Secret Service and had fingerprints and handwriting samples taken. Carl also was subpoenaed, gave handwriting exemplars, and was to be fingerprinted. The Alperts each engaged an attorney; they appeared to be cooperating with the government.

Although the government had sufficient evidence to indict, the Alperts desired to participate in plea negotiations. The government agreed to withhold indictments, and negotiations with the Alperts' attorneys occurred during March and April, 1990. After reviewing the evidence against the Alperts, the negotiations progressed to the point of discussing sentences. The last meeting was scheduled for April 18, 1990. When the Alperts realized that the sentencing judge was not bound by their prospective plea agreement,[1] they rented a U–Haul, packed their belongings, and abruptly left the jurisdiction. They departed without notification to family, creditors, school officials, the post office, or their respective attorneys to whom each of the Alperts owed fees. Even the Secret Service agent assigned to their case was unable to locate them. Using fictitious names along the way, the Alperts took a circuitous route to California, where they continued their credit fraud.

Without notice of the Alperts' departure, the government prepared for the expected meeting on April 18, 1990.[2] When the government learned that the Alperts had vanished, they were charged with fraud. Arrest warrants were issued, entered into NCIC, and placed on file with the United States Marshal's Service. Resulting from Carl's fraudulent lease of an automobile, the Alperts fortuitously were located in San Jose, California by the Santa Clara Police Department on September 20, 1990. Carl was using the aliases of William Charles Marino, Carlton Heboro and Steven Halpert. Identification and birth certificates seized from the Alperts' residence showed the names of Helene Sonya Gold, Steven Carl Gold, Helene Sonya Halpert, and Kenneth and Susan Anderson.

Prior to sentencing, the government requested a two-level enhancement for obstruction of justice. In each of the Alperts' presentence reports (PSRs), the probation office clarified that *the enhancement was not requested for fleeing from arrest,* but for impeding the investigation and attempting to avoid prosecution, both of which the Alperts were aware. Indeed, Carl gave a false name at his arrest and was returned to Atlanta in custody.

The district judge addressed the obstruction of justice enhancement at a thorough sentencing hearing. Regarding the Alperts' leaving Georgia during the plea negotiations, the Assistant United States Attorney (AUSA) advised the court that "[Carl Alpert's attorney] and [Helene Alpert's attorney] and myself and [the Secret Service agent] and [the United States Postal inspector] were involved in very detailed plea negotiations, *and it was understood that we [the government] were withholding an indictment to try to work out this case pre indictment.*" R4–83 (emphasis added). Carl's at-

---

1. *See* Majority Op. at 1106 n. 1; R4–81.

2. At oral argument before the en banc court, the government represented that, on April 15, 1990,

the Alperts registered at a hotel in Orlando, Florida, under the names of Kenneth and Susan Anderson, and amassed a bill of approximately $1,000.

torney conceded that the Secret Service agent informed him of his client's departure. There is no evidence that Carl's attorney knew where Carl was after he left Georgia. Helene's attorney was trying to locate her because she had not paid him for his services, and he did not know her whereabouts.

Concerning the obstruction of justice enhancement, the district court ruled as follows: "It seems to me that *the defendants['] leaving town in the middle of plea negotiations without notifying the government* and their use of phony names in California once they got there constitutes an obstruction of justice *since I infer that it slowed down the criminal process.*" *Id.* at 90–91 (emphasis added). Accordingly, the district court gave each of the Alperts a two-level enhancement for obstruction of justice.

In analyzing the obstruction of justice enhancement, the majority bases its discussion on *United States v. Burton,* 933 F.2d 916 (11th Cir.1991) (per curiam). *Burton* involved flight to avoid arrest, and this court recognized that such *instinctive,* on-scene flight from arresting officers did not constitute obstruction of justice. Because "a clear *mens rea* " is required for this enhancement to apply, the Guidelines commentary clarifies that fleeing from arrest does not qualify as obstruction of justice. *Id.* at 918; *see* U.S.S.G. § 3C1.1, comment. (n. 4(d)).

In contrast, the Alperts' cases have never been about flight from arrest; the Alperts absconded during plea negotiations. The vacated majority opinion in this case recognized the significance of the obstruction of justice enhancement at issue in this case: *"Whether Carl and Helene's departure from the Atlanta area during plea negotiations constitutes*

*willful obstruction of justice presents a novel issue that has not been considered by this Court* and is not addressed by the commentary to the Sentencing Guidelines." *United States v. Alpert,* 989 F.2d 454, 457 (11th Cir.1993) (emphasis added), *vacated on grant of rehearing en banc,* 10 F.3d 753 (11th Cir.1993). Thus, this case presents a first-impression issue for our circuit. Analogy to *Burton* or other flight from arrest cases is inappropriate. Additionally, I find commentary from our court, the Sentencing Guidelines,[3] and analogous cases in other circuits that encompass the situation of absconding during plea negotiations.

Although "traditionally obstruction of justice only relates to post-offense conduct occurring during the pendency of some judicial proceeding," [4] we specifically have found "no such limiting principle in the Guidelines." *United States v. Cain,* 881 F.2d 980, 982 (11th Cir.1989) (per curiam). Under section 3C1.1, *"[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels."* U.S.S.G. § 3C1.1 (emphasis added). By including the important qualification of "willfully," the Guidelines explicitly state a *mens rea* requirement. The Guidelines further note that "[o]bstructive conduct can vary widely in nature, degree of planning, and seriousness." *Id.* comment. (n. 2).

The section 3C1.1 commentary, providing specific examples where the obstruction of justice enhancement does and does not apply, is "non-exhaustive." *Id.* comment. (nn. 3 & 4). "[E]scaping or attempting to escape

---

3. The Alperts were sentenced under the 1988 version of the Sentencing Guidelines because they were less severe. As a reviewing court, however, we may consider subsequent clarifying commentary. *United States v. Howard,* 923 F.2d 1500, 1504 (11th Cir.1991). Indeed, the majority concedes that none of the exceptions in *Stinson v. United States,* — U.S. —, —, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993), are present in this case to preclude our being bound by the interpretation and clarification of the Guidelines commentary. Majority Op. at 1107 n. 2.

4. Obstruction of justice is readily evident in the truth-finding phase of the criminal justice system, particularly in a judicial setting. *See United States v. Morales,* 977 F.2d 1330, 1331 (9th Cir. 1992) (per curiam) (contempt for refusal to testify at coconspirator's trial after grant of immunity), *cert. denied,* — U.S. —, 113 S.Ct. 1399, 122 L.Ed.2d 772 (1993); *United States v. Brum,* 948 F.2d 817, 819–20 (1st Cir.1991) (perjury at trial); *United States v. Matos,* 907 F.2d 274, 276 (2d Cir.1990) (untruthful testimony at suppression hearing).

from custody before trial or sentencing; or *willfully failing to appear*, as ordered, for a judicial proceeding" are examples where the obstruction of justice enhancement applies, and they are analogous in their *willful or purposeful planning requirement. Id.* at comment. (n. 3(e)). Accordingly, the enhancement has been applied in instances of failure to appear, including nonjudicial settings. *See United States v. Draper*, 996 F.2d 982, 984–87 (9th Cir.1993) (failure to report to community corrections center during pretrial release); *United States v. Teta*, 918 F.2d 1329, 1332–1335 (7th Cir.1990) (failure to appear at arraignment); *United States v. Perry*, 908 F.2d 56, 59 (6th Cir.) (failure to report to probation officer while on bond pending sentencing), *cert. denied*, 498 U.S. 1002, 111 S.Ct. 565, 112 L.Ed.2d 571 (1990).

These cases involving failure to appear were decided on the rationale of *knowledge*, implicating intent, and *delay* or obstruction of the administration of justice. In *Draper*,[5] the Ninth Circuit focused on the willfulness requirement of section 3C1.1; "[t]he guideline's *mens rea* element 'requires that the defendant "consciously act with the *purpose* of obstructing justice."'" 996 F.2d at 984 (quoting *United States v. Lofton*, 905 F.2d 1315, 1317 (9th Cir.) (quoting *United States v. Stroud*, 893 F.2d 504, 507 (2d Cir.1990)), *cert. denied*, 498 U.S. 948, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990)). Distinguishing between fleeing from arrest and escaping from custody, the court concluded that "a narrow or technical reading of the term 'custody' is not appropriate" and that, for purposes of the obstruction guideline, "'custody' need only involve some degree of official control over a defendant." *Draper*, 996 F.2d at 985 (emphasis added). The court noted that the defendant must have *submitted* to the government, "willfully or otherwise," for the obstruction adjustment to obtain. *Id.* at 986. It determined that the enhancement was appropriate because "Draper undoubtedly 'attempt[ed] to escape justice' after having been submitted to process." *Id.* (citation omitted).

Concerning the defendant-appellant's argument that his release violation did not have a significant impact on trial or sentencing proceedings so as to be considered an obstruction of justice, the *Draper* court found that it *postponed* his sentencing and observed that it caused additional work for the pretrial services office, the district court, and law enforcement agents, amounting to a "'significant disruption.'" *Id.* at n. 4 (emphasis added) (quoting *United States v. George*, 911 F.2d 1028, 1030 (5th Cir.1990) (per curiam)). The court emphasized that "for purposes of the obstruction adjustment, it is *irrelevant* whether *justice is actually obstructed or impeded.* It is *sufficient* that the conduct in question has the *potential for obstructing the investigation, prosecution, or sentencing* of the instant offense." *Id.* at 986 (emphasis added) (citations omitted). The court determined that "the district court did not clearly err in concluding that Draper *intended to obstruct justice* and therefore *possessed the mental state* required under Guidelines section 3C1.1." *Id.* at 987 (emphasis added).

In *Teta*,[6] the Seventh Circuit thoroughly analyzed the *willfulness* component of section 3C1.1. The court distinguished flight to avoid arrest and flight during proceedings "that would *impede the investigation or*

---

5. *Draper* is analogous to the Alperts' factual situation because the defendant-appellant failed to report to his assigned community corrections center, where he was awaiting sentencing after pleading guilty to a bank robbery. A warrant for his arrest was issued, and he was arrested two weeks later, during which time he had robbed another bank. The district court gave him a section 3C1.1 enhancement and explained "'that defendant obstructed justice because he violated the conditions of his release from the community corrections center by failing to report to the corrections center, thereby impeding the administration of justice.'" *Draper*, 996 F.2d at 984.

6. The *Teta* defendant-appellant failed to appear for his arraignment, necessitating the district court's issuing a bench warrant for his arrest. Like the district court in this case, the district judge in *Teta* held a sentencing hearing during which the proposed enhancement for obstruction of justice was discussed. That district court concluded that the defendant-appellant's failing to appear by leaving the jurisdiction demonstrated a willful disregard for the law because he *knew* that charges were pending against him.

*prosecution, thereby obstructing justice."* *Teta*, 918 F.2d at 1333 (emphasis added). An evasive act at arrest is done for the *purpose* of avoiding arrest, while a subsequent evasive act during proceedings implicitly is done for the *purpose* of obstructing justice. *Id.* The court concluded that an act *consciously* done for "the *purpose* of *obstructing justice"* was synonymous with an act *"voluntarily* and *intentionally"* done for the *purpose* of *"disobeying or disregarding the law." Id.* (emphasis added).

The Seventh Circuit then analyzed the meaning of "obstruction" under section 3C1.1. The court rejected the suggestion that obstruction be restricted to conduct that threatens the truth-finding function of the court, such as perjury, destruction or concealment of material evidence, and providing false information.

Although § 3C1.1 certainly applies to conduct "calculated to mislead or deceive" that may affect the truth-finding function of the court, *it also applies to willful interference with the disposition of criminal charges, conduct that may hinder the progress of a case without the use of deceit.* We believe that *a defendant's willful failure to appear is conduct falling into the latter category. Id.* at 1334 (emphasis added) (footnote omitted).

The court also noted that a defendant's conduct creating a *delay* causes a loss of the government's time and resources by impeding judicial proceedings.

It is difficult to imagine conduct that more clearly interferes with the administration of justice than a defendant's failure to be present. *When the disposition of the charges cannot proceed until the defendant's presence is secured, and when he must be brought to court under arrest,* as transpired in this case, *there is obstruction of justice.*

*Id.* at 1335 (emphasis added).

In *Perry*, the defendant-appellant failed to appear for an interview with his probation

officer, fled the jurisdiction, and delayed his sentencing for eight months, necessitating the issuance of an arrest warrant. Concluding that this conduct impeded the administration of justice sufficient to incur the section 3C1.1 enhancement, the Sixth Circuit reasoned that the defendant was "no stranger to the criminal justice system," and could *"be presumed to have known* that he was not free to decamp after his conviction." 908 F.2d at 59 (emphasis added). Finding it sufficient for the enhancement that an instruction of the probation officer was disobeyed, the court determined that "[i]f providing false information to the probation officer in the course of a presentence investigation falls within this guideline, as the Application Notes to § 3C1.1 say it does, *so does failing to report to the probation officer at all." Id.* (emphasis added).

The Alperts' conduct is more analogous to these nonappearance cases, in which the obstruction of justice enhancement has been applied, than to the flight from arrest cases cited by the majority. These nonappearance cases establish that, once a defendant has agreed to submit to government process, he or she is not free to abscond without notifying the government. In this case with overwhelming documentary evidence of criminal activity, the Alperts had submitted to the government by giving handwriting exemplars in response to grand jury subpoenas. They also committed to plea negotiations with the government, although the government had sufficient evidence to indict them. Expecting cooperation, the government agreed not to indict them, but to negotiate a plea. The Alperts' abrupt departure without notification demonstrates that they were disingenuous, and that they misled and deceived the government when they agreed to cooperate in plea negotiations in lieu of an indictment.

Good faith participation is implicit in plea negotiations,[7] and such cooperation necessi-

---

7. *See United States v. Valencia,* 985 F.2d 758, 761 (5th Cir.1993) ("good faith in negotiating plea bargains") (citing *Santobello v. New York,* 404 U.S. 257, 262–63, 92 S.Ct. 495, 498–99, 30 L.Ed.2d 427 (1971)); *United States v. Lewis,* 980 F.2d 555, 561 (9th Cir.1992) ("delay ... occa-

sioned by the government's justifiable reliance on [appellant's] good faith in plea bargaining"); *United States v. Carini,* 562 F.2d 144, 149 (2d Cir.1977) (during plea negotiations, accused "demonstrate[s] his good faith," a precursor of his faithful performance of the plea bargain, a

tates availability of clients for their representative attorneys to proceed on their behalf. The Alperts' absconding from the jurisdiction during plea negotiations terminated those negotiations and forced the government to indict them and to obtain arrest warrants.[8] Although the Alperts were not required to accept the plea negotiated, they had committed themselves to the *negotiation process* through their respective attorneys and through their personal participation in the investigation by giving handwriting exemplars and fingerprints.

Clearly, *intent* or *mens rea* is crucial to the *willfulness* requirement for the application of the obstruction of justice enhancement under the Guidelines, a factor that the majority does not acknowledge, much less, analyze. The Alperts' packing all of their belongings for their clandestine departure without notification to anyone, including their attorneys, and their use of fictitious names to disguise their circuitous route and whereabouts indicates considerable deliberateness and premeditation. Their contention that they were not obstructing justice because they did not know that the case against them had been filed or that arrest warrants had been issued is unavailing. The Alperts knew of the grand jury investigation pending in Georgia when they left for California, and they were aware of the plea negotiations. Their actions *caused* the fraud case to be filed and the arrest warrants to be issued. They *should have known* that their disappearance would and did cause these results.[9] *See Perry,* 908 F.2d at 59. According to their respective PSRs, the Alperts had crimi-

nal histories, so they were not strangers to the criminal justice system.

Comments by the district judge at the sentencing hearing indicate that she included intent in her finding of obstruction of justice:

[Helen Alpert's new ATTORNEY]: I didn't represent them, but it appears to me that the record is absolutely devoid of the Alperts being or Mrs. Alpert having any knowledge of formal judicial proceedings started against them because there was no knowledge of them.

THE COURT: *You mean she didn't know there w[ere] efforts being undertaken to negotiate a plea?*

[ATTORNEY]: Well that may very well be, Your Honor, but until there is a formal complaint or formal arrest warrant, she is not under the criminal justice system, you know, where she has an obligation to the criminal justice system.

R4–88–89 (emphasis added). When the sentencing judge found that the Alperts had obstructed justice by leaving Atlanta during plea negotiations, the qualification of "without notifying the government" indicates recognition of their intent. R4–90–91.

Concerning *delay,* the government could have filed fraud cases against the Alperts at the outset while they were in town, but it agreed to engage in plea negotiations and to proceed by information. Although the United States Attorney's office, the Secret Service, and the Postal Inspector had attempted to accommodate the Alperts, the plea negotiations were derailed by the Alperts' departure. The government had to present their

---

" 'condition precedent' " to the government's consent to reduction or elimination of charges (citation omitted)); *United States v. Jennings,* 778 F.Supp. 477, 483 (D.Neb.1990) (government's "pursing in good faith plea negotiations, at least partially at the request of the defendant").

**8.** The fact that the Alperts left the jurisdiction and not their attorneys, "the negotiators" on their behalf, is not a valid distinction from the nonappearance cases discussed. The attorneys could not continue to negotiate with the government or represent their clients' interests without consulting with their departed clients. It was not as if the Alperts gave their attorneys permission to negotiate on their behalf while they took a circuitous trip to the West Coast, and they agreed to be in regular telephonic contact. Their attor-

neys, to whom the Alperts each owed fees, had no notice of the Alperts' departure and no way of contacting their clients.

**9.** Accordingly, I am unpersuaded by the Alperts' attempt to distinguish their cases because they were preindictment, or they were not under arrest warrants when they disappeared. The Alperts' respective counsel conceded to the en banc court at oral argument that there could be preindictment obstruction of justice, but maintained that their clients' conduct did not qualify. Because the Alperts were not under indictment or arrest warrants, there is no way to punish their conduct of absconding during plea negotiations *except* through an adjustment at sentencing. The obstruction enhancement appears to be the appropriate penalty.

cases to a grand jury, and have warrants issued for their arrest. Prosecution was delayed for five to six months until the Alperts were located and returned to Atlanta from California. *See Draper*, 996 F.2d at 986 (on the issue of government delay for nonappearance, "a two week absence is more than enough"). Clearly, these are evasive acts which would permit the district judge to infer that the administration of justice was impeded as required by the statute for the obstruction of justice enhancement. The Alperts' conduct obviously *did impede* the administration of justice, commencing with the government's withholding indictment pending the Alperts' alleged good faith participation in plea negotiations, and compounding with their extended time away from the jurisdiction. Thereafter, government resources had to be diverted from other cases and rechanneled in investigating the whereabouts of the Alperts, and ultimately in filing cases against them, issuing warrants for their arrest, and transporting Carl across the continent.

Significantly, the majority fails to mention our standard of review when a district court imposes the obstruction of justice enhancement. When reviewing a Guidelines sentence, we "shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e).[10] The Ninth Circuit explicitly has held "that once the court finds facts sufficient to constitute an obstruction of justice, the point addition for the obstruction is mandatory." *United States v. Avila*, 905 F.2d 295, 297 (9th Cir. 1990). Indeed, we have noted that "[t]he district court's determination that a defendant has obstructed justice is a factual finding which *must be affirmed* unless it is clearly erroneous." *United States v. Kramer*, 943 F.2d 1543, 1552 (11th Cir.1991) (per curiam) (emphasis added), *cert. denied*, ⎯ U.S. ⎯, 113 S.Ct. 63, 121 L.Ed.2d 31 (1992). Thus, our *factual* review should be complete if we find no clear error in the district judge's finding that the Alperts left the jurisdiction in the middle of plea negotiations without notifying the government.[11] Our *legal* analysis then should focus on whether this conduct is appropriate for the application of section 3C1.1.

I am satisfied that the district court stated sufficient factual causation, the Alperts' *departure* during plea negotiations with *knowledge* that pleas were being negotiated in lieu of indictment, to support its inference that the administration of justice was obstructed. The majority is troubled by the district judge's "inference."[12] I submit that the *fact-finding*, that the Alperts left the jurisdiction during plea negotiations is not clearly erroneous, and that the conclusion that this constituted an obstruction of justice as to this first-impression issue is the judge's application of the law to that fact. "[T]he obstruc-

**10.** *See Burton*, 933 F.2d at 917 (district court's factual findings are reviewed under the clearly erroneous standard, while its interpretation and application of the Sentencing Guidelines is subject to *de novo* review); *accord Morales*, 977 F.2d at 1330–31 (Ninth Circuit); *United States v. St. Cyr*, 977 F.2d 698, 701 (1st Cir.1992); *United States v. Surasky*, 976 F.2d 242, 244 (5th Cir. 1992); *United States v. Gardiner*, 931 F.2d 33, 34 (10th Cir.1991); *Teta*, 918 F.2d at 1332 (Seventh Circuit) (other circuits also review for clear error the district court's finding that a defendant obstructed justice and the interpretation or application of the Sentencing Guidelines *de novo*).

**11.** I omit the district court's inclusion of the Alperts' use of fictitious names in California as a basis for the obstruction enhancement because their PSRs indicate that this conduct already was considered as relevant conduct for sentencing purposes. Although the district court recognized that including the California fraud as relevant conduct did not affect the offense level, R2–54–2 n. 1, I note that the Alperts' use of false names in California impeded their location for prosecution. The Alperts' absconding during plea negotiations, however, is sufficient for the obstruction enhancement. *See Draper*, 996 F.2d at 983–84 (although the defendant-appellant robbed another bank after failing to appear at his community corrections center following pleading guilty to bank robbery, the obstruction enhancement was given solely because he failed to appear at the corrections center).

**12.** "Infer" means "to derive as a conclusion from facts or premises." Webster's Ninth New Collegiate Dictionary 619 (9th ed. 1990). This function describes *legal* analysis performed by judges. In essence, the sentencing judge said that, because the Alperts *factually* absconded from the jurisdiction during plea negotiations, they *legally* obstructed the administration of justice.

tion of justice provision ... represented a broad residual and omnibus provision whose sweeping language permitted application to a variety of different circumstances." *United States v. John,* 935 F.2d 644, 647 (4th Cir. 1991). Because neither we, nor any other circuit has been confronted with the applicability of this enhancement where defendants absconded during plea negotiations, we should scrutinize carefully the district court's determination that the Alperts' *factual* conduct constituted *legal* obstruction of justice.

In our plenary review capacity, we are in a better position to apply the law. From the nonappearance cases considered by other circuits, I analogize that willful, purposeful evasion of plea negotiations, after having submitted to the government, plainly results in obstruction of justice, as this case demonstrates. The teaching of those cases is that *willfulness can be inferred* or follows from action where there has been a knowing submission to the government and resulting delay occasioned by evasive conduct thereafter. *See United States v. Emery,* 991 F.2d 907, 912 (1st Cir.1993) (all that is required for the obstruction of justice enhancement is that "*some* official investigation is underway at the time of the obstructive conduct"). We have affirmed a section 3C1.1 enhancement with a one-sentence statement that the district court found that the defendant lied during plea negotiations and that these lies impeded investigation of the offense.[13] *United States v. Bushert,* 997 F.2d 1343, 1354 (11th Cir.1993); *see United States v. Villarino,* 930 F.2d 1527, 1529 (11th Cir.1991) (summary disposition as to factual findings at sentencing does not preclude meaningful appellate review); *United States v. Wise,* 881 F.2d 970, 973 (11th Cir.1989) (same). I submit that the sentencing judge's *factual* conclusion that the Alperts obstructed justice was not clearly erroneous, and, under a *legal* knowledge and delay analysis appropriate in nonappearance

situations, the Alperts obstructed justice within the meaning of section 3C1.1.

Moreover, the majority, in my view, has established a troubling circuit precedent, which will mislead district courts. By concluding on the facts of this case that "persons engaged in criminal activity" who learn of a preindictment investigation into that activity are free to "disappear to avoid arrest, *without more*" does not warrant a section 3C1.1 enhancement, the majority necessarily holds that absconding during plea negotiations is acceptable conduct. Majority Op. at 1107 (emphasis added). I submit that the "more" that the majority omits is the Alperts' good faith commitment to the plea negotiations. Further, the Alperts' cases were well beyond the "investigation" stage. The government had conducted its investigation for several years; it *had* the evidence to indict, but agreed to enter into plea negotiations with the Alperts at their instigation and based on their agreement to cooperate. I am uncomfortable with our circuit's implicit holding that, although there is sufficient evidence to indict, individuals engaged in criminal activity, ostensibly cooperating with the government, are free to abscond during plea negotiations with no accountability or sentencing penalty. As a result of this holding, the government understandably could be reluctant to engage in plea negotiations when it has sufficient evidence to indict.

By premising its analysis on flight to avoid arrest, the majority ignores the facts. The Alperts' conduct was premeditated flight to *avoid prosecution.* In fact, Helene never was arrested. The respective PSRs explicitly state that flight from arrest is not the basis for the requested obstruction enhancement. In giving the enhancement, the sentencing judge does not state that it is because the Alperts fled to avoid arrest. Yet, the majority elects to use inapplicable flight from arrest analysis for this first-impression issue rather than considering analogous cases of nonappearance.

---

13. While we have required an independent factual finding for a section 3C1.1 enhancement in cases of perjury, the reasoning was to preclude the district court from relying solely on the jury verdict to show the untruthfulness of the defendant's testimony. *See United States v. Lawrence,*

972 F.2d 1580, 1581–83 (11th Cir.1992) (per curiam), *cert. denied,* — U.S. —, 113 S.Ct. 1015, 122 L.Ed.2d 162 (1993); *United States v. Husky,* 924 F.2d 223, 224–25 (11th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 111, 116 L.Ed.2d 81 (1991).

Although the majority remands for resentencing, it forecloses the eligibility of absconding from plea negotiations for a section 3C1.1 enhancement and essentially tells the district court to "try again" if it wants to impose this enhancement.[14] In revisiting the appropriateness of an obstruction of justice enhancement, the majority advises the district judge to determine if the Alperts "engaged in *additional* conduct while avoiding arrest ... that would warrant application of the obstruction enhancement, particularly if that conduct significantly hindered the investigation or prosecution of their offenses."[15] Majority Op. at 1107. I disagree because I am convinced that the Alperts' absconding during plea negotiations *was* a sufficient impediment to the prosecution of their consolidated cases to warrant the obstruction enhancement. The district court should have been affirmed as to the section 3C1.1 enhancement in the Alperts' respective sentences.

## II. UPWARD DEPARTURE

The United States Attorney's office in Atlanta, in conjunction with the Secret Service and Postal Inspector, began investigating credit card and credit-related fraud committed by the Alperts in 1988. The fraudulent acts included completing and mailing applications for credit cards with fictitious names, using those cards upon receipt, falsifying lease documents for automobiles, and fraudulently obtaining a home loan from a bank. The Alperts defrauded numerous financial institutions and companies of over $500,000 between 1984 and 1990. Carl pled guilty to violating the following federal statutes: 18 U.S.C. § 1029(a)(2) (access device fraud), 42 U.S.C. § 408(g)(2) (providing a false Social Security number), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1001 (false statement to United States Postal Service), 18 U.S.C. § 1708 (theft or receipt of stolen mail matter), 18 U.S.C. § 1014 (false statement on a loan application).

On October 16, 1991, the first of a two-part sentencing hearing, the AUSA described Carl Alpert as the "mastermind" of the operation, "a very clever man who learned how to manipulate credit histories and how to route credit cards all over the country, and he organized a very complex scheme." R4-40. He compared Carl's credit fraud scheme to

---

**14.** It is important to recognize precisely *what* the majority is saying. The majority is not remanding for resentencing on the issue of the Alperts' absconding from plea negotiations so that the district judge can rectify this basis for the obstruction enhancement by reciting a mechanistic litany of obvious impediments to the prosecution of their cases, such as obtaining indictments and arrest warrants, locating the Alperts, all culminating in a five-to-six-month delay in the prosecution. The majority holds that absconding from the jurisdiction during plea negotiations is not obstruction of justice and, thus, is ineligible for the section 3C1.1 enhancement. The district court must find other qualifying conduct to apply the obstruction enhancement on remand. Thus, the majority *forecloses* the Alperts' absconding during plea negotiations from consideration under section 3C1.1. *This* is the holding that I find to be an incorrect precedent for our circuit, and one that is unwarranted under analogous law.

**15.** While excepting the Alperts' departure during plea negotiations from the obstruction enhancement, the majority appears to suggest that Carl's giving a false name when he was arrested might be eligible for the section 3C1.1 enhancement, provided it significantly hindered the investigation or prosecution of his fraud crimes. The use of a fictitious name at arrest *can obstruct justice* by deliberately hindering an investigation when the arrestee has a prior criminal record which would not be learned as easily if the true name had been provided. *See Gardiner*, 931 F.2d at 35–36; *United States v. Brett*, 872 F.2d 1365, 1372–73 (8th Cir.), *cert. denied*, 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989); *see also United States v. Ojo*, 916 F.2d 388, 392–93 (7th Cir.1990) (using fictitious names is eligible for the obstruction enhancement if this practice is the *modus operandi* for the charged crime). Because the Guidelines provide that giving a false name at arrest does not justify the obstruction enhancement unless "such conduct actually resulted in a significant hindrance to the investigation or prosecution" of the offense charged, sufficient factual findings are required to overcome the general ineligibility of this conduct for a section 3C1.1 enhancement. U.S.S.G. § 3C1.1, comment. (n. 4(a)).

Since the district judge did not state that Carl's use of a false name at arrest was a basis for the obstruction enhancement, she may have concluded that this conduct was an insufficient impediment to surmount the Guidelines caveat. That issue is not before us, and I consider it erroneous to suggest to the district court that this might be a sufficient basis for the obstruction enhancement, while holding that absconding during plea negotiations is not. The Guidelines generally do not exempt nonappearance as a hindrance to investigation and prosecution from the obstruction enhancement as they do giving a false name at arrest.

"running a small corporation," which included telephone answering services to verify credit cards, rerouting of cards to different mailboxes, acquiring post office boxes in fictitious names, and creating and using aliases for himself and his wife. *Id.* at 40–41, 42, 45. From 1984 to 1989, the Alperts thus received benefits from fraudulent credit cards amounting to hundreds of thousands of dollars, including traveling to Florida and Hawaii, buying expensive clothes, leasing luxury cars, and fraudulently obtaining a home loan.

Carl testified that he alone completed the false credit card applications for himself and his wife, that he communicated with the credit card companies by telephone, that he had used a credit card stolen from a neighbor's mailbox, that he would retrieve credit cards from his own mailbox that his wife had returned thinking that they were addressed improperly, that he acquired post office boxes with fictitious names, that he had used these fraudulent credit cards at various hotels while on trips, such as to Disney World and Hawaii, and that he leased a Mercedes Benz and a Lexus under fictitious names and told his wife that they were rental cars. When asked if he was the one who communicated with the credit card companies by telephone, Carl testified, "Yes, always, *only me,*" and further stated that "I was the only person that decided anything.... *This was Carl Alpert period.*" *Id.* at 48, 59 (emphasis added).

At the sentencing hearing, the district judge reviewed Carl's offense level of 15, including enhancements for the amount of money involved and for more than minimal planning under sections 2F1.1(b)(1) and (b)(2). Although a two-level enhancement under section 3B1.1(c) was recommended in Carl's PSR, the sentencing judge did not impose this enhancement for Carl's role as the organizer and supervisor of the fraudulent schemes.[16] She informed counsel that she was considering an upward departure for Carl to level 17, citing not only the *duration* of the fraudulent scheme and the *number* of

different transactions, which she viewed as a series of separate crimes rather than a single crime spanning an amount of time, but also Carl's *intent,* apparently referring to his successfully devising, planning, and executing numerous separate credit frauds.

> Mr. Alpert's *level of intent [concerning the fraudulent schemes] was very high....* The record is absolutely clear that this went on for a period of at least four years, maybe a little longer, and I have the impression that Mr. Alpert is a very intelligent man, very smart man, and that he knew exactly what he was doing, and I really haven't heard anything that mitigates his conduct.

R4–94–95 (emphasis added).

On October 23, 1991, the sentencing hearing reconvened on the issue of upward departure. In response to the district judge's inquiry as to a description of the fraudulent acts covered by the indictment, Carl's attorney explained that "there is *a credit card application,* there is *the use of the credit card,* and *there is the mail,* and *they tend to come in groups of three's,* and then there is the incident where his brother-in-law took the credit card out of a mailbox. *There are not 42 separate acts.*" *Id.* at 116 (emphasis added). Importantly, the attorney informed the court that "*the credit cards were used obviously many more times than 42 times.*" *Id.* at 117 (emphasis added). Impressed by the number of fraudulent transactions, the judge stated:

> I have the impression, and I guess I could go through the presentence report and count the various instances, but *I have the net impression that there were many, many affirmative acts of fraud,* a lot of different companies involved, different credit cards, the bank, the leasing companies, and *it's my impression that we would be talking about more than 20 schemes.*

*Id.* (emphasis added).

The district judge then gave the following explanation for the upward departure in Carl's sentence:

---

16. Additionally, we have affirmed a two-level enhancement for a mother's involvement of her adult daughter in drug trade as an abuse of trust under section 3B1.3. *United States v. Ledesma,* 979 F.2d 816, 822 (11th Cir.1992). The PSR indicates that Helene, who was reared in a dysfunctional family and overborne by Carl from a young age, was involved in the credit fraud completely at his direction. This appears to be a valid ground on which the sentencing judge could have enhanced Carl's sentence, but she did not.

I think this is a case where an upward departure is warranted. The reason I think it is warranted is because of the *very large number of affirmative acts of fraud* which in my opinion are *not adequately covered by the factors accounted for under the Guidelines.*

I do believe the defendant is correct in pointing out that there has been *an adjustment for more than minimal planning,* and this is certainly a case that fits that category, but even that adjustment *does not adequately take into account the number of acts of fraud* in this case.

I do not think it is appropriate for Mr. Alpert to get the same sentence for *these many, many fraud schemes that covered so many years, four to five years, and involved so many victims* as would a bank teller who undertook one embezzlement that yielded $475,000. I simply think that the social harm that was brought about by what Mr. Alpert did is much greater, and that's *not something that is just based on a victim headcount,* and it certainly isn't based on the *amount of money* which I do agree is already taken into account by the Guidelines.

*Id.* at 128 (emphasis added).

The judge departed upward by three levels in Carl's sentence, giving him a one-level reconciliation departure and a two-level departure for the reasons stated above. Thus, his total offense level was 18, yielding 36 months of imprisonment. His PSR recommended an adjusted offense level of 20, 37 to 46 months of imprisonment, and suggested that his was an *unusual* case for which an upward departure would be appropriate. The government's concern was that Carl's Guidelines sentence should provide a sufficient deterrent to prevent others from being enticed into similar fraudulent activity with relatively little punishment.

While I agree with the majority that the reconciliation departure was improper,[17] I disagree with its analysis that the two-level departure was incorrect because the district judge based this departure on factors for which the Guidelines already account. Since Carl received enhancements under section 2F1.1(b)(1) for the dollar loss amount and under section 2F1.1(b)(2) for "more than minimal planning"[18] or "a scheme to defraud more than one victim,"[19] the majority concludes that the additional two-level departure for the reasons given by the district judge was erroneous. The majority's presentation of the facts is deficient and it considers inapplicable law.

A sentencing court may depart from the Sentencing Guidelines upon determining "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). Similarly, the Guidelines policy statement concerning departure states:

> The controlling decision as to whether and to what extent departure is warranted can only be made by the courts.... *Any case may involve factors* in addition to those identified that have *not been given adequate consideration* by the Commission. *Presence of any such factor may warrant departure* from the guidelines, under some circumstances, *in the discretion of the sentencing court.* Similarly, *the court may depart* from the guidelines, *even though*

---

**17.** We have held that "'insufficient disparity'" in codefendants' sentences is an improper ground for departure. *United States v. Chotas,* 968 F.2d 1193, 1198 (11th Cir.1992) (per curiam).

**18.** Section 2F1.1 governs enhancements for fraud and deceit. The base offense level is 6. U.S.S.G. § 2F1.1(a). Section 2F1.1(b)(1) is a "loss table," which lists the loss amount with a corresponding enhancement level. Sections 2F1.1(b)(2)(A) and (b)(2)(B) provide an additional two-level enhancement for "more than mini-

mal planning" or "a scheme to defraud more than one victim." In addition to a base offense level of 6, a complex fraud case may have enhancements under both sections 2F1.1(b)(1) and (b)(2), as in this case.

**19.** The Guidelines provide for these cumulative rather than alternative enhancements under sections 2F1.1(b)(1) and (b)(2), and they do not constitute double punishment for the same conduct. *United States v. Rayborn,* 957 F.2d 841, 844 (11th Cir.1992) (per curiam); *United States v. Villarino,* 930 F.2d 1527, 1529 (11th Cir.1991).

*the reason for departure is taken into consideration* in the guidelines (*e.g.,* as a specific offense characteristic or other adjustment), if the court determines that, in light of *unusual circumstances,* the guideline level attached to that factor is inadequate.

U.S.S.G. § 5K2.0 (emphasis added). These two statutes provide a sentencing court with the authority or leeway to depart from a Guidelines sentence. *See United States v. Huang,* 977 F.2d 540, 544 (11th Cir.1992); *see also* U.S.S.G. Ch. 1, Pt. A 4(b), intro. comment. (despite the "heartland" of "typical cases," a court may depart in "an atypical case," although "a particular guideline linguistically applies," because "the Commission does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case"). " 'We will not lightly disturb decisions to depart.' " *United States v. Passmore,* 984 F.2d 933, 938 (8th Cir.1993) (quoting *United States v. Diaz–Villafane,* 874 F.2d 43, 50 (1st Cir.), *cert. denied,* 493 U.S. 862, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989)).

In *United States v. Weaver,* 920 F.2d 1570, 1573 (11th Cir.1991), we established a three-part analysis for appellate review of a district court's Guidelines departure. First, we review *de novo* "whether the guidelines adequately consider a particular factor so as to preclude a district court from relying upon it as a basis for departure." *Id.* Second, under clearly erroneous review, we determine "whether there exists sufficient factual support for the departure." *Id.* Third, giving due regard to the district court's opportunity to judge the credibility of witnesses and deference to its application of the Guidelines to the facts, we evaluate the degree of departure " 'by a standard of reasonableness.' " *Id.* (quoting *Diaz–Villafane,* 874 F.2d at 49).

The Fourth Circuit, which uses the same tripartite departure analysis, describes the first step of the analysis as follows: "The issue here is not, however, simply whether a section of the Guidelines takes into consideration a particular circumstance; the issue is whether that section *adequately* takes this circumstance into consideration." *United States v. Palinkas,* 938 F.2d 456, 461 (4th Cir.1991), *vacated,* —— U.S. ——, 112 S.Ct. 1464, 117 L.Ed.2d 610, *reinstated,* 977 F.2d 905 (4th Cir.1992). Reviewing a upward departure after enhancements under sections 2F1.1(b)(1) and (b)(2), the Fifth Circuit has concluded that "when a district court determines that 'built-in' aggravating circumstances are not adequately considered by the Guidelines in this fashion [in excess of conduct that ordinarily is involved in the conviction offense], our review is limited under the abuse-of-discretion standard." *United States v. Davidson,* 984 F.2d 651, 654 (5th Cir.1993). Thus, we should scrutinize closely the judge's articulated reasons for departing upward in Carl's sentence to determine whether the Sentencing Commission considered them adequately in the section 2F1.1(b) enhancements that Carl received.

The majority summarizes the district court's two-level upward departure as "designed to account for the duration and extent of the fraud." Majority Op. at 1108. In its conciseness, the majority oversimplifies and incompletely states the sentencing judge's reasons for the upward departure. The district court departed because of (1) the large number of affirmative fraudulent acts that covered an extensive period, four to five years, and (2) the high level of intentful creativity, planning, and complicated execution exhibited by Carl. The departure should be reviewed in the context of the record and testimony presented at the sentencing hearing, since there was no trial.

As to the *number* of fraudulent acts,[20] Carl's attorney readily admitted to the sentencing judge that *all of Carl's fraudulent activity was not covered.* The attorney stated that the fictitious credit cards were used *"many more times "* than the offense conduct of the PSR or indictment covered. R4–117 (emphasis added). He made the same admission before this en banc court at oral

---

20. Carl's PSR contains sixteen pages describing his offense conduct that culminated in the forty-

two-count indictment, to which he pled guilty to forty-one counts.

argument. Additionally, making false applications for credit cards, mailing the applications, and using the fraudulently obtained cards in creatively deceitful ways were separate acts of fraud.

Because *all* of Carl's fraudulent conduct was not encompassed, the enhancement from the dollar loss table of section 2F1.1(b)(1) is not an accurate representation of the monetary loss. We further have recognized that, under section 2F1.1(b)(1), intended or attempted loss may be cumulated with actual loss. *United States v. Rayborn,* 957 F.2d 841, 844 (11th Cir.1992) (per curiam); *see* U.S.S.G. § 2F1.1, comment. (nn. 6 & 7). Intended loss was not included in the computed dollar amount of $500,001 used to calculate Carl's enhancement under section 2F1.1(b)(1). Contrary to the majority's assertion that Carl "defrauded eight financial institutions of almost $500,000," [21] Majority Op. at 1109, the dollar loss table does not provide "an objective and quantifiable measure of loss" as to the monetary loss or direct victims [22] resulting from Carl's fraudulent conduct, *id.*

The Guidelines define section 2F1.1(b)(2)(A), "more than minimal planning," to mean "more planning than is typical for commission of the offense in a *simple form* " and find this characteristic present "in any case involving *repeated acts* over a *period of time,* unless it is clear that each instance was purely opportune." U.S.S.G. § 1B1.1, comment. (n. 1(f)) (emphasis added). This enhancement is *pro forma* or commonplace in fraud cases; "[t]hroughout the guidelines, if more than minimal planning is considered a specific offense characteristic, a two-level upward adjustment is recommended." *United States v. Kramer,* 943 F.2d 1543, 1550 (11th Cir.1991), *cert. denied,* — U.S. —, 113 S.Ct. 63, 121 L.Ed.2d 31 (1992); *see, e.g., United States v. Hendrieth,* 922 F.2d 748, 751 (11th Cir.1991) (per curiam) (approving the more than minimal planning enhancement for the negotiation of *one sale* of counterfeit currency). The sentencing judge specifically stated that the enhancement for more than minimal planning, which could be imposed for one act of embezzlement, did not adequately cover the fraudulent activity in this case. Thus, she indicated her recognition of a typical "heartland" Guidelines sentence, including an enhancement for more than minimal planning.

In considering whether the " 'on-going nature' " of a bank fraud scheme was encompassed in the two-level, more than minimal planning enhancement, the Fourth Circuit determined that "[t]he Commission considered *planning* in this section of the Guidelines; it did not consider the constant fraudulent activity executed by a defendant." *Palinkas,* 938 F.2d at 462. The court "conclude[d] that section 2F1.1(b)(2)(A) does not adequately encompass the 'on-going nature' of the scheme." *Id.* Similarly, the Eighth Circuit concluded that the more than minimal planning enhancement did not capture "the pervasive character" of the fraudulent scheme, which justified an upward departure under section 5K2.0. *Passmore,* 984 F.2d at 937. "The increases in the base level of the offense did not adequately reflect [the appellant's] commission of similar frauds in three other states and his solicitation of persons in the eastern, southwestern and northwestern parts of the country to purchase nonexistent football tickets." *Id.* Although the district court in *Passmore* in explaining its reasons for departure mentioned that the fraudulent conduct had occurred "over a period of years" and in "various states," *id.* at 935, the Eighth Circuit considered the *time* element to be included in the continuous, pervasive nature of the fraud, *see id.* at 937. That reasoning seems appropriate in this case. *But see United States v. Benskin,* 926 F.2d 562, 566 (6th Cir.1991) (upholding the trial court's departure based in part on "nearly five years" of fraudulent activity).

The commentary to section 2F1.1 states that "the harmfulness and seriousness of the

---

**21.** Like the monetary amount of the fraud, the *number* of financial institutions defrauded is not determinative. If a single financial institution is defrauded more times than is indicated in the PSR, then the monetary loss table of section 2F1.1(b)(1) is inadequate.

**22.** Direct victims are those that actually incur the monetary loss. Such victims are related necessarily to the amount lost. *See* U.S.S.G. § 2F1.1(b)(2)(B).

conduct" may warrant an upward departure. U.S.S.G. § 2F1.1, comment. (n. 9). Additionally, "[a] complex scheme *or repeated incidents of fraud* are indicative of an intention and potential to do considerable harm." *Id.* (backg'd) (emphasis added). The sentencing judge explained that she considered each scheme to be a different transaction rather than one continuous operation. "[I]t is consistent with the goals of the sentencing guidelines to depart upward for criminal activity related to the offense of conviction, but not reflected in the adjusted offense level." *United States v. Ledesma,* 979 F.2d 816, 822 (11th Cir.1992). Carl's planning was calculated, extensive and sophisticated. I am convinced that the vast number of Carl Alpert's fraudulent *schemes* and fictitious credit card *usages,* many of which were *not included in* his offense conduct, *are* a valid basis for the upward departure.

Additionally, the sentencing judge emphasized at the first sentencing hearing that she was impressed by *the heightened level of intent* shown by Carl in his calculated pursuit of so many affirmative acts of fraud. Carl was the mastermind or instigator of numerous and various intricate credit card and credit fraud schemes. In *Davidson,* the Fifth Circuit rejected three of the four grounds used by the district court to depart upward after giving enhancements under sections 2F1.1(b)(1) and (b)(2), but concluded that "the extraordinary planning and meticulous execution involved in the fraudulent scheme ... was so extraordinary that the Guidelines did not adequately consider this 'built-in' aggravating factor." 984 F.2d at 655. Since the judge did *not give Carl an* enhancement for his role in the offense, which also would have been a two-level adjustment, it appears to me that the record clearly supports her view that an upward departure was appropriate for Carl's unusual intent, demonstrated in his calculated planning and execution as instigator and operator of the various fraudulent schemes.

The majority's terse discussion does not progress past the first step of our review of an upward departure because of its cursory conclusion that the duration and extent of the fraudulent conduct had been considered by the Guidelines. Determining that the reasons upon which the judge relied for upward departure were not adequately considered by the Sentencing Commission, I progress to the second part of the analysis, whether there is *sufficient factual support* for the departure. There is ample record support for the factual bases for upward departure, which I conclude is not clearly erroneous. *See U.S. v. Wilson,* 993 F.2d 214, 218 (11th Cir.1993). ("[T]he district court is in the best position to hear the evidence and draw reasonable inferences therefrom in making specific factual findings....").

The third and final part of our review analysis is to determine the *reasonableness* of the sentencing court's departure. " 'This review is "quintessentially a judgment call" and we respect the district court's superior "feel" for the case.' " *Passmore,* 984 F.2d at 936 (citation omitted). In reviewing the reasonableness of the degree of departure, we must "look[ ] to the amount and extent of the departure in light of the grounds for departing" and the purposes for sentencing. *Williams v. United States,* —— U.S. ——, ——, 112 S.Ct. 1112, 1121, 117 L.Ed.2d 341 (1992); *see United States v. Emery,* 991 F.2d 907, 912 (1st Cir.1993).

> [W]hen the court has provided a reasoned justification for its decision to depart, and that statement constitutes an adequate summary from which an appellate tribunal can gauge the reasonableness of the departure's extent, it has no obligation to go further and attempt to quantify the impact of each incremental factor on the departure sentence.

*Emery,* 991 F.2d at 913.[23]

After giving Carl enhancements under sections 2F1.1(b)(1) and (b)(2), the sentencing

---

**23.** In *Passmore,* the Eighth Circuit affirmed under section 5K2.0 a four-level upward departure after an enhancement under sections 2F1.1(b)(2)(A) and (b)(2)(B), which increased the Guidelines sentencing range from 18 to 24 months to 30 to 37 months. 984 F.2d at 937. In

*Davidson,* the district court decided that the 15-to-21-month Guidelines sentence, which included a section 2F1.1(b)(2) enhancement, was inadequate and departed upward to produce a sentence of 24 months, equivalent to a one-level departure. 984 F.2d at 653 & n. 1. The Fifth

judge departed upward two levels in Carl's sentence for the reasons discussed. His offense level was still *under* the adjusted offense level and consequent imprisonment time recommended in his PSR. Because a Guidelines sentence is committed to the discretion of the trial court, we generally will not review it on appeal, provided the sentence falls within the Guidelines range. *Hendrieth*, 922 F.2d at 751.

I agree with the district court that Carl's fraudulent conduct involves factors not adequately considered by the Sentencing Commission or factors, although considered, that occur in unusual circumstances. These factors remove his sentence from the "heartland" of typical fraud cases sufficiently accommodated by the loss table of section 2F1.1(b)(1) and the more than minimal planning/victim enhancement of section 2F1.1(b)(2). The two-level upward departure not only comports with section 3553(b) and section 5K2.0, but also is *reasonable* and should have been affirmed.

### III. CONCLUSION

The majority concludes that absconding during plea negotiations is not obstruction of justice and that Carl's fraudulent conduct was typical and did not warrant an upward departure after enhancements for monetary loss and more than minimal planning. Because the majority ignores pertinent facts, its legal analysis is misguided. This awry analysis results in flawed precedents. Accordingly, I dissent.

Circuit affirmed, even though the court rejected three of the four grounds given by the district court for the departure. *Id.* at 657. In *United States v. Boula*, 932 F.2d 651 (7th Cir.1991), however, the district court, after giving an enhancement under section 2F1.1(b)(2), devised its own " 'vector' " system to arrive at a ten-level upward departure, resulting in an offense level of 31 and 108 months of imprisonment. *Id.* at 653–54. The Seventh Circuit found this upward departure to be *unreasonable*. *Id.* at 658.