PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
09/03/99
THOMAS  K. KAHN
CLERK

_____

No. 98-6396

_____

D. C. Docket No. CR 97-B-266-S

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICAH RUDISILL,
TIM HALL RUDISILL,
a.k.a. Timothy Rudisill,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(September 3, 1999)

Before ANDERSON, Chief Judge, RONEY, Senior Circuit Judge, and COOK*,
Senior District Judge.

---

*Honorable Julian Abele Cook, Jr., Senior U.S. District Judge for the Eastern District of
Michigan, sitting by designation.

ANDERSON, Chief Judge:

Micah Rudisill ("Micah") and his father, Tim Rudisill ("Tim"), appeal various issues relating to their convictions and sentences on one count of conspiracy to defraud, 18 U.S.C. §§ 371, 2314 (1994), eleven counts of interstate transportation of securities taken by fraud, id. at § 2314, and one count of conspiracy to commit money laundering, id. at §§ 1956(a)(1)(A)(i), 1956(h). After careful review of the record, we find no reversible error in the district court's rulings. Thus, we affirm the convictions and sentences in all respects.

## I. FACTS

Micah Rudisill and Melvin White ("White") met in 1991 while working as salesmen for a telemarketing company known as the Great American Catalog Company. Both changed jobs frequently over the next few years and worked together at several similar places before they decided to form their own telemarketing company sometime in 1993 to be operated from a location in the Atlanta, Georgia area. Because Micah was only about 19 years old at the time, it was agreed that White would handle the financial end of the business, whereas Micah would be in charge of making the telemarketing calls. Company names were continuously changed in

response to complaints to the Georgia Attorney General's office, until the formation of two companies known as Southern Health and American Distributing. These companies are the ones named in the indictment.

Individuals who received calls from Southern Health or American Distributing (most of whom were elderly) were told that they had won $50,000, but that they could not collect the prize until they paid a federal "transfer" fee. Generally, the fee was between $2,500 and $3,000. Upon receipt of this fee, the individual was told, the prize would be sent. Of course, there was no prize to be had.

Tim heads an organization known as the Society of Stewards, an allegedly religious entity that does not solicit contributions from its members. Tim first met White, albeit briefly, while visiting his son, after Micah went into business with White. Tim met White a second time for a slightly longer period, at which encounter White showed him around the office. Both of these meetings occurred prior to the formation of Southern Health and American Distributing. Nonetheless, at the second meeting, Tim was in the front room, where salesmen could be overheard making fraudulent pitches to their targets.

Micah and White established a mailing address in Georgia to receive the funds. The checks received were then deposited in banks in Birmingham, Alabama. The money in the Alabama accounts was then either used to pay business expenses of the

3

telemarketing operation or distributed out as profit. White signed blank checks and also made out checks to Micah, Tim, and the Society of Stewards. On at least one occasion, Tim personally cashed one of White's checks under circumstances that aroused the suspicions of bank officials and caused them to question Tim about the funds. The checks to the Society of Stewards amounted to $32,150, and accounted for the entire amount in the Society's bank account other than $200 contributed by two unidentified individuals.

Eventually, bank officials at one of the Alabama banks with which White had opened an account became suspicious and requested that White close the account. He and Micah drove to Birmingham on January 24, 1995, to close the account. While White was in the bank, he was served with a grand jury subpoena to provide fingerprints, photographs, and handwriting exemplars. Soon thereafter, White met Micah at an Atlanta hotel, bringing with him $18,000 from the closing of the bank account. Micah encouraged White to become a fugitive instead of providing the information to the grand jury that was required by the subpoena. Micah suggested to White that the money might be marked and convinced White that he should turn over the money to Tim so that Tim could exchange it for non-marked money. Micah telephoned Tim and Tim came to the hotel. White gave the cash to Tim, in exchange for a receipt from the Society. White testified that he and Tim specifically discussed:

4

the existence of the grand jury subpoena; the possibility that the money was marked; the need to have it exchanged for non-marked money; the need to return it to White so that he could have money to live on while in hiding; the possibility of White fleeing to countries without extradition treaties with the United States; and the protection afforded to Micah by virtue of White's decision to flee, for which Tim offered his gratitude to White. Upon White's departure from the hotel, Micah gave him $1,000 for use as he fled the authorities. White did not appear before the grand jury on January 31, 1995, as required. Micah provided White with an additional $4,000 while he was a fugitive.

White's fugitive status was short-lived; the authorities caught him in Fort Lauderdale, Florida, on March 26, 1995. Subsequently, White pled guilty to ten counts of interstate transportation of securities taken by fraud, in violation of 18 U.S.C. § 2314 (1994). He was ultimately sentenced to 39 months in custody, along with restitution of $80,296 and three years of supervised release.

Based on the same conduct to which White pled guilty, a grand jury indicted Micah and Tim[1] in 1997 for eleven counts of interstate transportation of securities taken by fraud, as well as conspiracy to commit fraud and conspiracy to commit

---

[1]    A third co-defendant was also indicted, but the jury acquitted him on all counts.

money laundering.[2] These counts were based on the activities undertaken by Southern Health and American Distributing between May of 1994 and January 24, 1995. At trial, White was the government's star witness. Also, Tim testified in his own defense at trial, but refused to testify as to the conversation between White and himself at the Atlanta hotel. Micah and Tim were ultimately found guilty on all counts.

In calculating Micah's sentence, the district court, <u>inter alia</u>, enhanced the sentence for obstruction of justice, and denied Micah's application for a downward departure based on the disparity between his sentence and that of White. With respect to Tim's sentence (as well as Micah's), the district court applied the enhancement for vulnerable victims. In this opinion, we address only these sentencing issues, as well as Tim's challenge to the sufficiency of the evidence with respect to the conspiracy convictions. The other claims of the appellants are rejected without need for discussion.

## II. MICAH RUDISILL

A.      Obstruction of Justice Enhancement

---

[2]      A fourteenth count was later withdrawn by the government.

Micah contends that the district court wrongly enhanced his offense level by two points for obstruction of justice. See U.S.S.G. § 3C1.1.[3] After White had been detained by law enforcement officers and served with a grand jury subpoena to provide fingerprints, photographs and handwriting exemplars, Micah encouraged White to flee and become a fugitive. Micah argues that simply avoiding or fleeing from arrest does not justify the obstruction of justice enhancement, and therefore Micah's encouragement of this conduct certainly should not constitute obstruction of justice.

It is true that United States v. Alpert, 28 F.3d 1104 (11th Cir. 1994) (en banc), stands for the proposition that avoiding arrest, alone, does not warrant the enhancement. See id. at 1107; see also U.S.S.G. § 3C1.1, cmt. 4(d). We disagree with Micah, however, that Alpert compels the conclusion that urging and aiding someone else to flee from law enforcement authorities can never form the basis for an obstruction enhancement. In this case, White testified that he originally had planned to honor the subpoena, but that Micah convinced him to flee and become a fugitive, giving him cash to facilitate same. Micah also advised White that the $18,000 which White had withdrawn from the bank account shortly before might be marked, and

---

[3]    Throughout this opinion, we cite to the 1997 version of the Sentencing Guidelines Manual, which was in effect at the time that Micah and Tim were sentenced.

arranged for his father, Tim, to exchange the potentially marked cash for clean cash, thus reducing the risk that the marked cash might abort White's fugitive status. The district court found that Micah's primary reason for assisting White in this manner was an attempt to avoid investigation into his own criminal activities because Micah feared that White would cooperate with law enforcement if he appeared pursuant to the grand jury subpoena.

We readily conclude that the district court's findings and its application of the obstruction of justice enhancement are not clearly erroneous. The Guidelines provide as an example of obstructive behavior "threatening, intimidating, or otherwise unlawfully influencing a co-defendant." See U.S.S.G. § 3C1.1 cmt. 3(a).[4] We found sufficient evidence of this type of conduct in United States v. Garcia, 13 F.3d 1464, 1471 (11th Cir. 1994), in which the defendant brought a potential witness into a walk-in freezer at his place of business and asked the witness not to cooperate with an FBI investigation. The Eighth Circuit relied on our decision in Garcia to uphold an

_____

[4]       In full, comment 3(a) provides: "[t]he following is a non-exhaustive list of examples of the types of conduct to which this enhancement applies: (a) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1 cmt. 3(a). The current version of the Guidelines includes the same provision, renumbered as comment 4(a). See U.S.S.G. § 3C1.1 cmt. 4(a) (1998) (using identical language, except that "enhancement" in the 1997 version is replaced with "adjustment" in the 1998 version).

enhancement in a case with very similar facts to Micah's. See United States v. Alexander, 53 F.3d 888, 890 - 91 (8th Cir. 1995). The defendant had provided money to a co-conspirator to assist him in fleeing the authorities. The court distinguished the Alpert situation, noting that "the acts in this case qualify as obstructing justice under section 3C1.1 not because Alexander helped Aldrich to flee justice, but because he attempted to put Aldrich out of the government's reach as a witness." Id. at 891. In our case, Micah encouraged a codefendant and potential witness to become a fugitive to ensure White's noncompliance with a grand jury subpoena, in an effort to obstruct law enforcement's access to evidence that would incriminate Micah. Such conduct supports an enhancement for obstruction of justice.[5]

---

[5] We recognize that Alexander is unclear as to whether the provision of money to the co-conspirator in that case was "unlawful." The Guideline commentary expressly indicates that the examples it provides are "non-exhaustive," see U.S.S.G. § 3C1.1 cmt. 3, so that the presence vel non of "unlawfulness" in Alexander may not be decisive. Nevertheless, one of the examples specifically supports the enhancement when "unlawfulness" is present. See U.S.S.G. § 3C1.1 cmt. 3(a) (describing the obstructive conduct as "threatening, intimidating, or otherwise unlawfully influencing ...") (emphasis added). In the instant case, Micah's encouragement of White's flight was clearly an unlawful influence because it was unlawful for White not to comply with the grand jury subpoena. Thus, the facts of the instant case fall more squarely within the quoted comment than do the facts in Alexander. Of course, we need not address the question of the applicability of the enhancement in a context in which the "unlawful" aspect is missing.

9

Micah's argument fails for the additional reason that it presumes that White's conduct was mere avoidance of arrest, when in fact it was obstructive in and of itself, thereby permitting enhancement of Micah's sentence for aiding and abetting White's obstruction. See U.S.S.G. § 3C1.1 cmt. 8. Alpert makes clear that its holding involved simple disappearance to avoid arrest "without more," and that "additional conduct while avoiding arrest" might warrant application of the enhancement. Id. at 1107. In this case, White's conduct does not involve mere flight; he deliberately refused to comply with a properly served subpoena to provide fingerprints, photographs, and handwriting exemplars. In United States v. Taylor, 88 F.3d 938, 944 (11th Cir. 1996), we expressly held that a defendant's refusal to comply with a subpoena for handwriting exemplars supported a § 3C1.1 enhancement. The fact that White fled, whereas the defendant in Taylor appeared as required, but then refused to give the handwriting exemplars, see id. at 943, does not bring the instant case within the scope of Alpert. The handwriting exemplars were evidentiary material that White was ordered to produce, but did not. Thus, White's noncompliance with the subpoena and, more to the point, Micah's assistance in this endeavor amounts to "concealing or directing or procuring another person to ... conceal evidence that is material to an official investigation." See U.S.S.G. § 3C1.1 cmt. 3(d); see also United States v. Yusufu, 63 F.3d 505, 514 (7th Cir. 1995) (concluding that disguising a handwriting

10

exemplar amounts to concealing evidence and citing comment 3(d)); United States v. Reyes, 908 F.2d 281, 290 (8th Cir. 1990) (holding that refusing to provide handwriting exemplars constituted "concealing material evidence" as provided for in the commentary to the 1989 version of the Guidelines, thereby warranting an obstruction enhancement).[6]

B.      Downward Departure Based on Disparity of Sentence

Ordinarily, decisions by a district court not to depart downward from the prescribed sentencing guidelines range are unreviewable on appeal. See United States v. Chase, 174 F.3d 1193, 1195 (11th Cir. 1999). Such decisions are reviewable, however, if the district court denies the downward departure because of an erroneous belief that the court lacked the authority to make such a departure. See id.

Micah argues that the district court thought that it had no authority to downwardly depart on the basis of a gross disparity in sentence between Micah and

---

[6]      Our conclusion renders it unnecessary for us to consider whether failure to comply with the grand jury subpoena warrants the enhancement on the independent basis that it constitutes "willfully failing to appear, as ordered, for a judicial proceeding." See U.S.S.G. § 3C1.1 cmt. 3(e). We note, however, that at least one appellate court has held that, whether or not a grand jury proceeding is actually a judicial proceeding, the expressly non-exhaustive character of the examples provided in the commentary make clear that such a failure to appear before a grand jury does justify enhancement. See United States v. Monem, 104 F.3d 905, 909 (7th Cir. 1997).

11

White, despite their similar conduct. He points to the following exchange between his attorney and the court in support of this claim:[7]

> Mr. Martin: Your Honor, I think I am entitled to go on the record whether the Court is of the mind that it is not entitled to downwardly depart because of the disparity and under the <u>Koon</u> case –
>
> The Court: Yes.... I am saying when I said I am denying it without comment, I want the record to reflect that I believe I have already addressed it on the record and denied it on the record and, yes, I am denying your motion for downward departure based on disparity in the sentence between ... the guideline that is now going to be applicable to your client versus the guideline to Mr. White.

7 Rec. on Appeal, at 69 - 70.

Had the court simply stopped at "yes," we might conclude that Micah's contention is a plausible interpretation of the district court's understanding of his authority, or at least that there was significant ambiguity. <u>See</u> <u>United States v. Webb</u>, 139 F.3d 1390, 1395 (11th Cir. 1998) (concluding that the district court expressed ambivalence about its authority to depart and holding that "on balance ... the record

---

[7] Micah does not specifically identify this exchange in his brief on appeal and does not discuss it in the section of his brief dealing with this issue. <u>See</u> Brief for the Appellant Micah Rudisill, at 24. He does cite to the pages in the record containing this exchange in his statement of facts, however, and we construe his obscure references to point to this exchange. <u>See id.</u> at 20.

12

more strongly suggests that the court believed that it was not authorized"). However, the entire statement makes it reasonably clear to us that all the court was doing was incorporating its prior discussion of the downward departure as the basis for its ruling. In that prior discussion, the court rejected the premise upon which Micah's motion for downward departure was based: namely, that Micah and White were similarly situated, such that their sentences should be roughly equivalent if the goals of the Sentencing Guidelines are to be met. The court distinguished Micah's situation from that of White by saying:

> So a different Judge, different facts before that Judge, that was a plea, not a trial. I mean, the difference there not because he is being punished for going to trial, but how much evidence is before the Court at the time of sentencing. A lot more comes out at a trial that the Judge is aware of when a person goes to trial than you hear at the time of sentencing.
> ...
> There is a money laundering charge here that was not present in Mr. White's case. And the fact that he did not get [the] obstruction [enhancement], I don't know if the government argued for obstruction.

7 Rec. on Appeal, at 31, 33- 34. We think these statements, when read in conjunction with the ultimate denial of the downward departure, strongly point to the conclusion that the district court exercised its discretion in denying the downward departure based on its determination that White and Micah were not actually similarly situated. In other words, whether or not the court believed it had the authority to depart on the

13

basis of a sentencing disparity, the court did not believe that such a departure would

be warranted in this case.[8]  We will not disturb this conclusion.[9]


III.  TIM RUDISILL


A.    Sufficiency of the Evidence for Conviction

Tim challenges the sufficiency of the evidence for conviction of both

conspiracy counts.  In analyzing a sufficiency question, our review is de novo, but

"[w]e resolve all reasonable inferences and credibility evaluations in favor of the

---

[8]      Our construction of the district court's statements is further supported
by the sentencing hearing for Tim, in which the same judge, having heard the same
evidence, again denied the same motion for a downward departure six days after
sentencing Micah.  At that hearing, the court stated that "as I said at the sentencing
of Micah Rudisill, the Court here would not depart even if I felt I could depart to
adjust for a disparity in the sentence between ... this Mr. Rudisill and Mr. White."
8 Rec. on Appeal, at 35.  The court reiterated the factual distinctions between
White and the Rudisills that we quoted above, and twice more emphasized that no
downward departure was warranted based on these facts.  See id. (stating "if I
could depart downward to adjust for the disparity, this would be a case where I
would not" and "again, let me state clearly that if I could [depart], I would not").

[9]      In light of this decision, we need not address Micah's argument that
the Supreme Court's decision in Koon v. United States, 116 S. Ct. 2035 (1996),
eroded our prior decision in United States v. Chotas, 968 F.2d 1193 (11th Cir.
1992), which held that a district court could not depart simply because of a
disparity in sentence between codefendants.  We note, however, that we have
applied Chotas subsequent to the decision in Koon.  See United States v. Quinn,
123 F.3d 1415, 1425 (11th Cir. 1997).

jury's verdict." United States v. Suba, 132 F.2d 662, 671 (11th Cir. 1998). We will affirm the verdict as long as the jury could permissibly conclude that the defendant is guilty beyond a reasonable doubt. In conducting this inquiry, we keep in mind that "[t]he evidence may be sufficient even though it is not wholly inconsistent with every conclusion except that of guilt; the jury is free to choose among reasonable constructions of the evidence." Id. at 672.

We address the conspiracy to commit money laundering count together with the conspiracy to defraud because it is clear that the money laundering conspiracy was simply a means of financing the ongoing conspiracy to defraud. We have recently reiterated that "[i]n order to be convicted of a conspiracy one must have knowledge of such conspiracy and must intend to join or associate [himself] with the objective of the conspiracy." United States v. Calderon, 169 F.3d 718, 723 (11th Cir. 1999) (internal quotation marks omitted). For purposes of the conspiracy to defraud, the government must have presented sufficient evidence from which the jury could conclude that Tim had knowledge of and associated himself with a conspiracy to obtain money by false and fraudulent pretenses, in violation of 18 U.S.C. §§ 371 and 2314. For purposes of the conspiracy to launder money, the government must have presented sufficient evidence from which the jury could conclude that Tim had knowledge of and associated himself with a conspiracy involving financial

15

transactions in which the proceeds of the fraudulent activities were used to promote further fraud, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h).

Tim does not challenge the existence of the charged conspiracies. Indeed, there is ample evidence of the conspiracy to defraud by means of the telemarketing scheme which extracted money from the victims by false and fraudulent representations. With respect to the money laundering conspiracy, there is ample evidence that financial transactions with the proceeds of the unlawful activity were conducted with the intent to promote the carrying on of the unlawful activity. For example, the payroll and other expenses of the illegal enterprise were paid by checks written on the Alabama bank accounts. Rather than challenging the sufficiency of the evidence to support the conspiracies, Tim challenges only the sufficiency of the evidence of his personal knowledge of and association with the conspiracies.

We conclude that the evidence was sufficient to sustain Tim's convictions on the conspiracy counts. The evidence shows that Tim was present while suspicious telemarketing calls were being made on two occasions.[10] The jury could reasonably infer that Tim overheard what was happening and was aware that unlawful

---

[10]     Tim argues that these visits are not probative of his knowledge of the conspiracies, since they took place several months prior to the time period identified in the indictment. We disagree. The jury could readily infer that the nature of the "business" continued unchanged, and that Tim had knowledge thereof.

telemarketing was taking place. In addition to this knowledge of the conspiracy to defraud, the jury could reasonably infer knowledge of the conspiracy to launder. Tim knew that the unlawful activities were continuing and that the normal expenses thereof (e.g., payroll, phone bills, etc.) would be met with the proceeds of the fraud, and he knew that such expenses would be paid by means of financial transactions, i.e., financial transactions intended to promote the carrying on of the unlawful activity. After acquiring this knowledge that the illegal activities were on-going, instead of disassociating himself, Tim knowingly associated himself with and furthered the illegal activities by the actions described below.

Tim deposited checks written by White totaling more than $32,000 into the account of the Society of Stewards. Only $200 worth of contributions was obtained by the Society from other sources. In other words, Tim's alleged charity was funded almost entirely by the illegal business. Another $13,000 went directly to Tim. Bank officials from an Alabama bank testified to one instance in which they had requested permission from White before cashing an $8,000 check for Tim. At that time, Tim described White as a generous supporter of his church. White testified, however, that he had little knowledge of the Society of Stewards; rather, the funds were a portion of Micah's profits that he distributed to Tim on Micah's behalf. He further testified to signing several blank checks, specifically testifying as to one check that someone

17

other than he had written "emergency relief fund" in the memo section, which check found its way into the Society of Stewards' bank account. The jury could reasonably have credited White's testimony in these respects, permitting it to infer that Tim's statements to the bank officials were meant to conceal the illegal origins of the funds, and facilitate the continuation of the unlawful activities and avoid detection thereof. In addition, White described the meeting at the hotel during which White decided to flee. This provides strong evidence of Tim's knowledge of the conspiracies and of his association with them. At that meeting, White and Tim discussed the grand jury subpoena, the advisability of flight, the protection afforded to Micah if White fled, the promise of assistance while White was a fugitive, the possibility that some countries did not have extradition agreements with the United States, the likelihood that the $18,000 was marked, and the exchange of that $18,000 for "clean" money. Tim then did implement the exchange, taking the potentially marked $18,000 and giving White a receipt. Plainly, a jury could reasonably infer from these actions on the part of Tim that he had knowledge of the conspiracies and knowingly associated himself with them and furthered them and sought to avoid detection of them.

Our conclusion is bolstered by the fact that Tim testified in his own defense at trial. As we have previously stated, "when a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true."

18

United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995). Like the defendant in

Brown, Tim testified that he had no knowledge of any illegal telemarketing activities

and did not notice anything suspicious during his two encounters with White.[11] We

concluded in Brown that "the jury, hearing [the defendant's] words and seeing his

demeanor, was entitled to disbelieve [his] testimony and, in fact, to believe the

opposite of what [he] said." Id. Thus, Tim's testimony, combined with the other

evidence of his involvement in these conspiracies, convinces us that there was

sufficient evidence to sustain his convictions.


B.     Vulnerable Victim Enhancement

At the time of Tim's sentencing, § 3A1.1(b) of the Guidelines stated that

"[i]f the defendant knew or should have known that a victim of the offense was

unusually vulnerable due to age, physical or mental condition, or that a victim was

otherwise particularly susceptible to the criminal conduct, increase by 2 levels."

U.S.S.G. § 3A1.1(b). Tim does not challenge the existence of vulnerable victims in

this case, as the evidence clearly supports a conclusion that the telemarketing scheme

---

[11]     At sentencing, the district court expressly found that Tim had committed perjury in this regard. For example, in answer to a question as to whether his son, Micah, had discussed the business with him, Tim testified that nothing was said which aroused his suspicion of illegal activity. See 8 Rec. on Appeal, at 29.

targeted the elderly. He does argue, however, that he had no knowledge that the scheme was targeting the elderly.

Our review of the district court's factual determinations is for clear error only, and "we give due deference to the district court's application of the guidelines to the facts." United States v. Yount, 960 F.2d 955, 956 (11th Cir. 1992). The district court expressly found that it was reasonably foreseeable to Tim that elderly individuals were targeted, based on his degree of involvement in the conspiracy and the court's finding that Tim "knew of the scope of the activity." 8 Rec. on Appeal, at 31. Thus, the district court inferred from the evidence that Tim did know that elderly individuals were being targeted. We conclude that the record contains sufficient facts from which the court appropriately could draw such an inference.

## IV. CONCLUSION

We affirm the conviction and sentence of each appellant. The judgment of the district court is

AFFIRMED.