[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-14948
Non-Argument Calendar

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 22, 2005
THOMAS K. KAHN
CLERK

D.C. Docket No. 04-00026-CR-31DAB

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JULIAN NICHOLAS, JR.
a.k.a. Junior,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Middle District of Florida

_____

(June 22, 2005)

Before TJOFLAT, DUBINA, and MARCUS, Circuit Judges.

PER CURIAM:

Julian Nicholas, Jr., appeals his convictions and concurrent 98-month sentences for conspiracy to import 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 952(a) & 960(a)(1), (b)(2)(B)(ii); importation of 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 952(a), 960(b)(2)(ii); and possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(ii). On appeal, Nicholas argues the district court erred by (1) admitting statements he made to law enforcement following his arrest; (2) denying his motion for judgment of acquittal based on insufficiency of the evidence; and (3) increasing his sentence based on facts not charged in the indictment or found by the jury, in violation of Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). Subsequent to the filing of the briefs in this case, the Supreme Court extended its holding in Blakely to the federal Sentencing Guidelines. See United States v. Booker, 542 U.S. ___, 125 S. Ct. 738 (2005).

We review the district court's resolution of evidentiary issues for a clear abuse of discretion. See United States v. Mendez, 117 F.3d 480, 484 (11th Cir. 1997). We review challenges to the sufficiency of the evidence de novo, resolving all reasonable inferences from the evidence in favor of the jury's verdict. See United States v. Rudisill, 187 F.3d 1260, 1267 (11th Cir. 1999). The evidence is sufficient where a reasonable trier of fact, choosing among reasonable interpretations of the evidence,

2

could find guilt beyond a reasonable doubt. United States v. Lluesma, 45 F.3d 408, 409-10 (11th Cir. 1995).

As for Nicholas's constitutional, Blakely-based sentencing claim, he timely raised it in the district court and his initial brief in this Court, and thus he is entitled to preserved error review. See United States v. Paz, --- F.3d ---, 2005 WL 757876, *2 (11th Cir. Apr. 5, 2005). We will reverse a Booker error only if the error was harmful, meaning that the error affected substantial rights. Id.; see also United States v. Nealy, 232 F.3d 825, 829 (11th Cir. 2000) (reviewing preserved constitutional challenge to a sentence de novo, but stating we "will reverse or remand only for harmful error").

After thorough review of the record, as well as careful consideration of the parties' briefs, we find no error as to Nicholas's convictions. As for his sentence, although we find no constitutional error under Blakely, based on the intervening decision in Booker, and more specifically, Booker's remedial holding, we conclude we must vacate and remand for resentencing, pursuant to the discretionary Sentencing Guidelines scheme now required by Booker.

I.

The relevant facts are straightforward. On January 19, 2004, Nicholas was arrested at the Orlando International Airport, after he met Milton Meade, a co-

3

conspirator who had just arrived on a plane from San Juan, Puerto Rico, carrying a cooler filled with cocaine. Prior to trial, Nicholas moved in limine to exclude his statement to law enforcement, made shortly after his arrest at the Orlando airport, that the cooler seized from Meade "might" contain drugs. Nicholas argued that the statement was barred both by Fed. R. Evid. 602 and 701, because he lacked personal knowledge of the contents of the cooler, and by Fed. R. Evid. 403, because it was unfairly prejudicial. The district court summarily denied the motion.

At trial, the government first presented the testimony of Olga Silva, a Senior Inspector with the U.S. Customs Service who was assigned to interview passengers arriving at the airport in San Juan, Puerto Rico, on January 19, 2004. After she interviewed Meade, as he departed from a flight from Antigua to Puerto Rico, Silva x-rayed a cooler Meade was carrying. Meade claimed it contained frozen fish. The x-ray machine revealed that the fish contained a white powdery substance, which subsequent field tests revealed to be cocaine.

Martin Reyes, a Special Agent with the U.S. Immigration and Customs Enforcement Service ("ICE"), testified that, after meeting Meade in an interrogation room at the San Juan airport and informing him of his Miranda[1] rights, Meade told

[1] Miranda v. Arizona, 384 U.S. 436, 458-71, 86 S. Ct. 1602, 1619-26, 16 L. Ed. 2d 694 (1966).

Reyes that a man he knew as "Mello," who lived in Antigua, had purchased his plane ticket and provided him with the cooler containing the cocaine. Meade was supposed to deliver the cocaine to a man in Orlando, Florida named "Junior," and was promised $2,000 to $4,000 for his services. Meade said that he had made similar deliveries from Mello to Junior on three prior occasions, receiving between $2,000 and $4,000 for his services. Meade described Junior as a black male, approximately 5'8" tall, with an Afro, glasses, and long, slim sideburns. During the interview, Meade indicated to Special Agent Reyes that he would cooperate with the government. Special Agent Reyes than arranged for Meade to take a later flight to Orlando, Florida and make a controlled delivery of the cocaine.

Richard Mosquera, another ICE Special Agent, accompanied Meade on the later flight from San Juan to Orlando. Special Agent Mosquera testified that, while in San Juan, Meade made a number of "consensually monitored" calls to Mello in Antigua, so authorities could "hear his supplier talking about the smuggling venture." In these calls, Meade indicated that he had been delayed by a problem with his luggage, but was on a later flight. Meade's source indicated that "Junior" would meet Meade at the Orlando airport. Upon arrival in Orlando, Meade picked up his baggage, including the cooler, and met the defendant, Nicholas, in an area near the baggage claim. Special Agent Mosquera observed Nicolas talking on a cellular

phone when the initial contact with Meade took place. At that point, Meade tried to hand Nicholas the cooler, but Nicholas refused to take it. Nicholas had "a little bit of [a] conversation" with Meade, at which point Meade and Nicholas were both arrested.

Meade testified at trial as a government witness, describing how he had transported cocaine to the United States three times prior to his arrest for the instant offense. On each of these trips, Mello gave Meade a cooler to transport to Junior in Orlando. Also on each trip, Nicholas would give Meade between $50,000 and $60,000 to take back to Antigua. On the third trip, Nicholas paid Meade part of his $1,600 fee. Also during the third trip, Meade accompanied Nicholas to a Western Union to wire money to Mello in Antigua. Finally, Meade stated that Nicholas was talking to Mello on a cell phone when the two met, immediately prior to their arrest in Orlando.

Special Agent Jeff Harmon of the Drug Enforcement Administration ("DEA"), along with ICE Special Agent Saoud, interviewed Nicholas after his arrest on January 19, 2004. Harmon subsequently searched Nicholas's residence, pursuant to Nicholas's consent. Harmon discovered the following: (1) two canisters of black axle grease, which Harmon noted is sometimes used to mask the odor of cocaine; (2) a cooler that was "almost an exact match" with the cooler Meade had carried; (3) a

6

receipt indicating that Nicholas had spent $1,600 at a store in Orlando, and receipts for three money orders totaling $1,043; (4) a receipt from a Foot Locker store for an $861 purchase and a receipt from a Fifth Gear clothing store for a $2,360 purchase; (5) a lease agreement indicating that Nicholas was the official tenant of the apartment and the rent was $445 per month; and (6) a pay stub bearing Nicholas's name and dated December 20, 2002, indicating his year-to-date gross earnings were $6,640.

On cross-examination, Nicholas's attorney asked Harmon a series of questions about his post-arrest interview of Nicholas. Counsel first highlighted that Nicholas was cooperative with the agents and agreed to be interviewed. Counsel then asked: "And he [Nicholas] consistently denied any knowledge of the drugs [in the cooler], correct?" to which Harmon responded that, when he asked Nicholas, "Besides fish, what's in the cooler?" Nicholas said, "It might be drugs." Defense counsel did not object to this answer, but instead decided to ask Harmon to clarify what Nicholas might have meant by "it might be drugs."

This line of questioning included again asking Harmon whether Nicholas said he "<u>knew</u>" (as opposed to "guessed") what was in the cooler. Defense counsel's cross-examination on this point culminated in the following question: "And he [Nicholas] guessed that, 'Oh well, it might be drugs,' but he didn't know the type, correct?" When Harmon responded to this question in the affirmative, defense

7

counsel continued: "Wouldn't it be a very logical assumption or a very logical guess, if he had just been arrested by the D.E.A. at the airport, that -- and they're asking you about a cooler, that there might be narcotics in that cooler?" Harmon indicated that he did not know what Nicholas was thinking or what his logic was at the time of the interview to which defense counsel asked, "Well, you're a D.E.A. agent, right?" The cross-examination then proceeded on to other issues relating to Harmon's duties as a DEA agent.

As for chemical testing of the cocaine seized from the cooler, Juan Bruna, a senior forensic chemist with the DEA, testified that the ICE sent him an evidence bag via Federal Express which contained "four rectangular bricks" of a substance that appeared to be cocaine. He performed mass spectroscopy on the substance and the analysis indicated with "100 percent certainty" that the four bricks were cocaine. Bruna further stated that, excluding the packaging, the cocaine powder in the four bricks weighed a total of 3,992 grams. Over Nicholas's objection to the chain of custody, the government admitted the cocaine into evidence.

Finally, the government called Special Agent Saoud who testified that a typical personal-use amount of cocaine is three to four grams, and that the quantity of cocaine found on Meade was "a distribution amount." During Saoud's interview of Nicholas, Nicholas consented to a search of his cellular phone. The results of this

search indicated that Nicholas's phone had been used to call a number which Meade had also called that same day. Saoud said that the last person Nicholas called prior to his arrest was Mello, and that Nicholas had made 42 such calls to Mello's number in Antigua on the day he was arrested.

After the government rested, Nicholas moved for a judgment of acquittal on all three counts, arguing that because all of his activities occurred within the United States, there was no evidence that he had conspired to import cocaine or had personally imported cocaine. He also asserted that the government had presented no evidence that he ever took physical possession of the cooler after he met Meade. After the district court denied the motion, Nicholas rested without presenting any evidence.

The jury subsequently found Nicholas guilty on all three counts. On the verdict form, for each of the three counts, the jury indicated that Nicholas was responsible for "500 grams or more" of cocaine. Nicholas then proceeded to sentencing.

According to the presentence investigation report ("PSI"), Nicholas was responsible for 4.6 kilograms of cocaine, which yielded a base offense level of 30. With this base offense level and a category I criminal history, Nicholas's Guidelines range was 97 to 121 months' imprisonment. Nicholas filed a written objection,

making the general argument that <u>Blakely</u> rendered the Sentencing Guidelines unconstitutional, but not challenging any of the PSI's factual statements.

At the sentencing hearing, Nicholas reiterated his objection to the constitutionality of the Guidelines. Acknowledging this Court's decision in <u>United States v. Duncan</u>, 381 F.3d 1070 (11th Cir. 2004), <u>vacated and superseded on reh'g</u>, 400 F.3d 1297 (11th Cir. 2005), the district court responded, "the Eleventh Circuit has instructed me to continue to apply the guidelines until the Supreme Court resolves the issue." The district court also said that "District Judges in the Eleventh Circuit [must] continue to abide by the guidelines." The district court then adopted the PSI calculations and found the Guidelines range to be 97-121 months.

Prior to the imposition of sentence, defense counsel made a "statement in mitigation," arguing for the imposition of a sentence below the Guidelines range on two grounds: (1) because "Nicholas has no criminal record whatsoever," and (2) "due to the harshness of the Sentencing Guidelines." After again noting that it lacked discretion to sentence Nicholas outside of the Guidelines range, the district court imposed three concurrent 98-month terms of imprisonment, followed by a 4-year term of supervised release. This appeal followed.

II.

A.

10

First, Nicholas argues on appeal that the district court erred by admitting Special Agent Harmon's testimony that, during his post-arrest interview, Nicholas indicated the seized cooler "might" contain drugs. Notably, Harmon made this statement in response to defense counsel's line of questioning during cross-examination. As we have outlined above, defense counsel asked a series of questions concerning the post-arrest interview of Nicholas. One of Nicholas's theories of defense was that he never took possession of the cooler and had no reason to know it contained cocaine. The line of questioning about the post-arrest interview was in support of this theory of defense. During the exchange, counsel specifically asked whether Nicholas "consistently denied any knowledge of the drugs [in the cooler]." Harmon responded that, when he asked Nicholas, "Besides fish, what's in the cooler?" Nicholas said, "It might be drugs."

"It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1293-94 (11th Cir. 2002) (citation omitted), cert. denied, 537 U.S. 1147 (2003); see also United States v. Jernigan, 341 F.3d 1273, 1289 (11th Cir. 2003) ("[E]ven plain error review is unavailable in cases where a criminal defendant 'invites' the constitutional error of which he complaints." (quoting Ford, 289 F.3d at 1294)). Based on our review of the record, including the trial transcript,

11

we conclude that the invited-error doctrine precludes Nicholas's argument. We note that this rule is particularly applicable here, where Nicholas filed a pre-trial motion in limine in which he sought to exclude the statement about the cooler, thus indicating to us that defense counsel either was or should have been aware of this statement and Agent Harmon's knowledge of the statement. On this record, defense counsel's question invited the very response that he previously sought to exclude. Accordingly, any purported error caused by Agent Harmon's response was invited, and is not subject to review upon appeal.

## B.

As for Nicholas's challenge to the sufficiency of the evidence, we also find no error. Nicholas argues that Meade's testimony was the only evidence that tied him directly to the cocaine, and that the testimony was inconsistent, false, and self-serving. The jury has the exclusive power to determine the credibility of witnesses, and "the court of appeals may not revisit this question." United States v. Chastain, 198 F.3d 1338, 1351 (11th Cir. 1999). Testimony is incredible as a matter of law only when it includes "facts that [the witness] physically could not have possibly observed or events that could not have occurred under the laws of nature." United States v. Rivera, 775 F.2d 1559, 1561 (11th Cir. 1985) (internal quotations omitted) (brackets in original).

12

Here, the issue of whether Meade's testimony was consistent or credible was plainly a question for the jury, which, it would appear, accepted Meade's account as accurate. The jury was free to choose among reasonable interpretations of the testimony. See United States v. Peters, __ F.3d __, 2005 WL 673987, at *4, *6 (11th Cir. Mar. 24, 2005). "Moreover, we are bound by the jury's credibility determinations, and by its rejection of the inferences raised by the defendant." Id. at *4. Simply put, we are satisfied that the government presented abundant evidence, including Meade's testimony, as well as a litany of circumstantial evidence corroborating Meade's testimony, to support Nicholas's convictions.[2]

---

[2] We easily dispense with Nicholas's other conviction-related argument, that the district court erred by admitting into evidence the cocaine and cooler, both of which were seized from Meade following his and Nicholas's arrests, and the cooler in which the co-conspirator transported the cocaine. Nicholas argues the government did not establish a proper chain of custody for admission of this evidence. We reject this claim without further discussion since gaps in the chain of custody go to the weight of the evidence, rather than its admissibility. See United States v. Roberson, 897 F.2d 1092, 1096 (11th Cir. 1990) (citing United States v. Lopez, 758 F.2d 1517, 1521 (11th Cir. 1985) (observing that "the adequacy of the proof relating to the chain of custody is not a proper ground to challenge the admissibility of the evidence")). Even if Nicholas's argument fairly could be read to concern the weight of this evidence (as opposed to its admissibility), we remain unpersuaded. Under Fed. R. Evid. 901(a), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Here, the government's evidence was sufficient under Rule 901(a) and the jury was free to resolve the issue of chain of custody, and the various federal agencies' handling of the cocaine and cooler, against Nicholas. See United States v. Chaplinski, 579 F.2d 373, 374-75 (5th Cir. 1978) ("'The adequacy of the chain of custody was a factual question which the jury resolved against appellant(s).'" (quoting United States v. Graham, 464 F.2d 1073, 1076 (5th Cir. 1972)); cf. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all Fifth Circuit decisions issued prior to the close of business on October 1, 1981).

C.

Finally, Nicholas argues his sentence violated <u>Blakely</u>, which the Supreme Court has now extended to the federal Sentencing Guidelines in <u>Booker</u>. <u>See</u> 125 S. Ct. at 738. In <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." <u>Id.</u> at 490, 120 S. Ct. at 2362-63.

The Court subsequently applied the <u>Apprendi</u> rule in the context of Washington State's sentencing guideline scheme, clarifying that "the 'statutory maximum' for <u>Apprendi</u> purposes is the maximum sentence a judge may impose <u>solely on the basis of the facts reflected in the jury verdict or admitted by the defendant</u>. In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose <u>without</u> any additional findings." <u>Blakely</u>, 542 U.S. at ___, 124 S. Ct. at 2537 (citations omitted) (emphasis in original).

Most recently, in <u>Booker</u>, the Supreme Court found "no distinction of constitutional significance between the Federal Sentencing Guidelines and the Washington procedures at issue" in <u>Blakely</u>. <u>See</u> 125 S. Ct. at 749. The Court held

that the mandatory nature of the Guidelines rendered them incompatible with the Sixth Amendment's guarantee to the right to a jury trial. Id. at 749-52. As we recently observed, "[t]his constitutional holding 'means that it is no longer possible to maintain the judicial factfinding that Congress thought would underpin the mandatory Guidelines system that it sought to create.'" United States v. Garcia, --- F.3d ---, 2005 WL 845532, at *12 (11th Cir. Apr. 13, 2005) (quoting Booker, 125 S. Ct. at 757).

In the instant case, we find no Sixth Amendment violation within the meaning of Booker. The district court did not impose a sentence higher than that which the indictment charged and the jury's verdict authorized. Both the indictment and the jury verdict indicated that each of the three counts involved "500 grams or more" of cocaine. Nicholas's offense level was calculated under U.S.S.G. § 2D1.1(c)(5), which provides for an offense level of 30, rather than 26, when a controlled-substance offense involves, inter alia, "[a]t least 3.5 KG but less than 5 KG of Cocaine (or the equivalent amount of other Schedule I or II Stimulants)." At trial, the DEA forensic chemist, Bruna, testified that the cocaine in Meade's cooler weighed 3.992 kilograms.

Although the jury verdict stated the quantity of cocaine only as "500 grams or more," the jury's finding of guilt could be based on only one quantity: 3.992 kilograms. This is so because the only evidence on amount presented to the jury,

15

through Bruna's testimony, indicated the weight of the cocaine found in co-conspirator Meade's cooler, which was the 3.992-kilograms amount.[3] Cf. United States v. Nealy, 232 F.3d 825, 830 (11th Cir. 2000) (holding that in the context of an Apprendi challenge based on drug quantity, "[w]e must affirm [the] sentence if the record does not contain evidence that could rationally lead to a contrary finding with respect to drug quantity"). Nicholas was not held responsible for any additional cocaine. Moreover, he did not object to the PSI's factual statement on quantity, instead choosing to make only a general objection to the constitutionality of the Guidelines. Even during his "statement of mitigation," he urged the district court to impose a sentence below the Guidelines range based on only these two grounds: (1) his lack of a criminal history and (2) the harshness of the Guidelines.

On this record, where Nicholas was held responsible only for the quantity of cocaine presented to the jury during Bruna's testimony and he did not contest the PSI's statement of quantity at sentencing, there is no impermissible judicial fact finding in violation of the Sixth Amendment.[4]

---

[3] The PSI, which the district court adopted, indicated that Nicholas was responsible for 4.6 kilograms of cocaine. The discrepancy as to quantity between Bruna's testimony and the PSI had no effect on the calculation of Nicholas's offense level since Bruna's amount (3.992 kilograms) and the probation officer's amount (4.6 kilograms) both put Nicholas in the same offense level under § 2D1.1(c)(5).

[4] This fact distinguishes the case from our recent decision in United States v. Paz, __ F.3d__, 2005 WL 757876 (11th Cir. Apr. 5, 2005), which involved a six-level enhancement to the

Although there was no Sixth Amendment violation here, Nicholas was sentenced under the pre-Booker mandatory Sentencing Guidelines. The district court followed the correct sentencing procedure when it sentenced Nicholas, but "the Supreme Court has now excised the mandatory nature of the Guidelines in Booker." United States v. Shelton, 400 F.3d 1325, 1330 (11th Cir. 2005) (reviewing Booker claim for plain error). In Shelton, we concluded that "it was [non-constitutional] Booker error for the district court to sentence Shelton under a mandatory Guidelines scheme, even in the absence of a Sixth Amendment enhancement violation." Id. at 1330-31 (citing United States v. Rodriguez, 398 F.3d 1291, 1301 (11th Cir. 2005) ("the [non-constitutional Booker] error is the mandatory nature of the guidelines once the guidelines range has been determined")). "As a result of Booker's remedial holding, Booker error exists when the district court misapplies the Guidelines by considering them as binding as opposed to advisory." Shelton, 400 F.3d at 1331.

Here, although we find no Sixth Amendment violation because the district court did not increase Nicholas's base offense level based on findings about drug quantity, we find Booker error based on the remedial holding of the case. After

defendant's offense level based on judicial fact finding as to amount of loss. Thus, Paz involved constitutional Booker error.

17

adopting the PSI and its recommended Guidelines range, the district court treated the resulting range as mandatory. Had the district court treated the Sentencing Guidelines as advisory, it might have found that Nicholas was responsible for 3.9 kilograms of cocaine but nevertheless sentenced him below the Guidelines range for this quantity based upon other factors, such as the two grounds Nicholas argued during his "statement of mitigation." The district court treated the Sentencing Guidelines as mandatory, and on this record it is impossible to tell what sentence it would have imposed under an advisory reading of the Sentencing Guidelines.

Moreover, the government has not has not met its burden to show that the district court's non-constitutional Booker error was harmless, under Kotteakos v. United States, 328 U.S. 750, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946). Cf. United States v. Anderson, 289 F.3d 1321, 1326 (11th Cir. 2002), cert. denied, 537 U.S. 1195 (2003) (holding that Apprendi error, which is constitutional in nature, may be harmless if the government proves beyond a reasonable doubt that such error did not affect the defendant's substantial rights); Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").[5]

---

[5] The Kotteakos standard is less onerous than the "harmless beyond a reasonable doubt" standard applicable to constitutional errors under Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). See Smith v. Singletary, 61 F.3d 815, 818 (11th Cir. 1995) (noting that, in

"In cases involving preserved <u>Booker</u> error, the Government must show that the mandatory, as opposed to the advisory, application of the guidelines did not contribute to the defendant's sentence." <u>United States v. Davis</u>, No. 04-14585, slip op. at 4 (11th Cir. May 4, 2005) (citing <u>Paz,</u> 2005 WL 757876 at *2). A non-constitutional error is harmless unless it had a "substantial influence" on the outcome or leaves one in "grave doubt" as to whether it had such effect. <u>Kotteakos</u>, 328 U.S. at 765, 66 S. Ct. at 1248. Under the <u>Kotteakos</u> standard, "non-constitutional error is harmless if, viewing the proceedings in their entirety, a court determines that the error did not affect the verdict, or had but very slight effect." <u>United States v. Hornaday</u>, 392 F.3d 1306, 1315 (11th Cir. 2004) (internal quotation marks and citations omitted). "If one can say 'with fair assurance . . . that the judgment was not substantially swayed by the error,' the judgment is due to be affirmed even though there was error." <u>Id.</u> (quoting <u>Kotteakos</u>, 328 U.S. at 764, 66 S. Ct. at 1248); <u>see also</u> <u>United States v. Frazier</u>, 387 F.3d 1244, 1266 n.20 (11th Cir. 2004) (<u>en banc</u>) ("Errors do affect a substantial right of a party if they have a 'substantial influence' on the outcome of a case or leave 'grave doubt' as to whether they affected the outcome of a case." (quoting <u>Kotteakos</u>, 328 U.S. at 764-65, 66 S. Ct. at 1248)).

federal habeas context, "less onerous" <u>Kotteakos</u> standard, rather than <u>Chapman</u> standard, controls).

The district court was operating under the assumption that the Guidelines were mandatory, and in this case we cannot tell what sentence it would have imposed, particularly since Nicholas argued two grounds, unrelated to the issue of drug quantity, as supporting a lower sentence: (1) his lack of a criminal history and (2) the harshness of the Guidelines. On this record, the government has not met its burden to show harmlessness, or no effect on substantial rights. Cf. Davis, slip op. at 6 ("We simply do not know what the sentencing court would have done had it understood the guidelines to be advisory rather than mandatory, and had properly considered the factors in 18 U.S.C. § 3553(a)).

Because in this case, the government cannot establish the Booker non-constitutional error was harmless, within the meaning of Kotteakos, we vacate Nicholas's sentence and remand for resentencing in light of the remedial holding of Booker. No reversible error occurred during the guilt phase of the proceedings, and we affirm Nicholas's convictions.

**AFFIRMED, IN PART, VACATED AND REMANDED, IN PART.**